# EXHIBIT A

Hearing Date: 4/4/2023 11:00 AM
Location: Court Room 2302
Judge: Moreland, Caroline Kate

FILED
12/2/2022 12:33 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH11699
Calendar, 10
20523365

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT – CHANCERY DIVISION**

THE STATE OF ILLINOIS, BY
KWAME RAOUL, ILLINOIS
ATTORNEY GENERAL
*PLAINTIFF,*

V.

ELI LILLY AND COMPANY; NOVO
NORDISK INC.; SANOFI-AVENTIS
U.S. LLC; EVERNORTH HEALTH,
INC. (FORMERLY EXPRESS SCRIPTS
HOLDING COMPANY); EXPRESS
SCRIPTS, INC.; EXPRESS SCRIPTS
ADMINISTRATORS, LLC; ESI MAIL
PHARMACY SERVICE, INC.;
EXPRESS SCRIPTS PHARMACY, INC.;
MEDCO HEALTH SOLUTIONS, INC;
CVS HEALTH CORPORATION; CVS
PHARMACY, INC; CAREMARK RX,
L.L.C.; CAREMARKPCS HEALTH,
L.L.C.; CAREMARK, L.L.C.;
UNITEDHEALTH GROUP, INC.;
OPTUMRX INC.; AND
OPTUMINSIGHT, INC.

*DEFENDANTS.*

Case No.    **2022CH11699**

# COMPLAINT

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   PARTIES .......................................................................... 9

    A.    Plaintiff.......................................................................... 9

    B.    Manufacturer Defendants ........................................... 10

    C.    PBM Defendants........................................................... 15

III.   PUBLIC INTEREST ...................................................... 44

IV.   JURISDICTION AND VENUE ...................................... 45

V.    FACTUAL ALLEGATIONS ........................................... 46

    A.    Diabetes and Insulin Therapy.................................... 46

        1.    Diabetes: A growing epidemic.................................... 46

        2.    Insulin: A century old drug ........................................ 47

        3.    Current insulin landscape........................................... 49

        4.    Insulin adjuncts: Type 2 medications ........................ 52

    B.    The Dramatic Rise in the Price of Diabetes Medications ..................... 54

        1.    Insulin price increases................................................ 54

        2.    Manufacturers increased prices in lockstep .............. 60

    C.    Pharmaceutical Payment and Supply Chain........................... 65

        1.    Drug Costs for Diabetics. .......................................... 66

        2.    PBMs' role in the pharmaceutical payment chain ..................... 68

        3.    The rise of the PBMs in the pharmaceutical supply chain........ 70

        4.    Insular nature of the pharmaceutical industry........................... 72

    D.    The Insulin Pricing Scheme ................................... 76

    E.    Defendants Admit That They Have Engaged in the Insulin Pricing Scheme ........................................................ 81

ii

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

F.     Defendants Profit Off the Insulin Pricing Scheme .................................. 87

    1.    Manufacturers Profit Off Insulin Pricing Scheme ..................... 87

    2.    PBMs Profit Off Insulin Pricing Scheme ..................................... 87

        a)    PBMs pocket most of the secret Manufacturer Payments ...................................................................................... 88

        b)    PBMs profit off pharmacies ............................................... 93

        c)    Insulin Pricing Scheme increases PBM mail order and retail pharmacy profits ..................................................... 95

G.     Illinois Diabetics Purchase the At-Issue Drugs from Defendants ........ 96

H.     Defendants Deceived Illinois Diabetics .................................................. 96

    1.    Manufacturer Defendants deceived Illinois Diabetics ............... 96

    2.    PBM Defendants deceived Illinois diabetics ............................. 99

I.      The Insulin Pricing Scheme Has Damaged Illinois Diabetics ........... 108

    1.    The Insulin Pricing Scheme has damaged the State by increasing its healthcare costs and decreasing productivity ................................................................................. 108

    2.    The Insulin Pricing Scheme has damaged Illinois Diabetics ................................................................................... 109

J.      Defendants' Recent Efforts in Response to Rising Insulin Prices ....... 111

VI.    CLAIMS FOR RELIEF .................................................................... **113**

    1.    Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act") (Against All Defendants) ............................................................................ 113

    2.    Unjust Enrichment (Against All Defendants) ........................ 117

VII.   PRAYER FOR RELIEF ................................................................... **118**

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

## TABLE OF FIGURES

Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018 ....................................................................................................... 5

Table 1: Diabetes medications at issue in this case ...................................... 53

Figure 2: Rising list prices of Humulin R (500U/mL) from 1997-2021 ...................... 55

Figure 3: Rising list prices of Humalog vials and pens from 1996-2021 ................... 56

Figure 4: Rising list prices of Levemir from 2006-2021 ................................. 57

Figure 5: Rising list prices of Novolog vials and pens from 2002-2021 ................... 58

Figure 6: Rising list prices of Lantus vials and pens from 2001-2021 .................... 59

Figure 7: Rising list prices of long-acting insulins .................................... 61

Figure 8: Rising list prices of rapid-acting insulins ................................... 62

Figure 9: Rising list price increases for human insulins ................................ 63

Figure 10: Rising list prices of Type 2 drugs........................................... 64

Figure 11: Lockstep insulin price increases ............................................ 65

Figure 12: Insulin distribution and payment chain ...................................... 68

Figure 13: PBM consolidation ........................................................... 71

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

The Honorable Kwame Raoul, Attorney General, brings this action for injunctive and other relief against Defendants on behalf of the People of the State of Illinois (the "State" or "Plaintiff") for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1 *et seq*., the Illinois Uniform Deceptive Trade Practices Act ("Deceptive Trade Practices Act"), 815 ILCS 510/1 *et seq*., and the Illinois common law.

## I.    INTRODUCTION

1.      Diabetes is an epidemic and a public health crisis in Illinois. Illinois has a high prevalence of diabetes with approximately 13% of its population—1.3 million people—living with diabetes. An additional 3.6 million Illinois residents have prediabetes, which is when a person's blood sugar level is higher than it should be and signifies that the person is at greater risk for developing diabetes.

2.      Diabetes is the leading cause of blindness, kidney failure, and lower limb amputations and is the seventh leading cause of death in Illinois despite the availability of effective treatment. Approximately 20% of all hospitalizations in Illinois are attributable to diabetes.

3.      The economic impact of diabetes is staggering. The total estimated cost of diagnosed diabetes in Illinois is $12 billion per year. One in four health care dollars is spent caring for people with diabetes.

4.      Approximately half a million diabetics in Illinois rely on daily insulin treatments to survive, and over a million diabetics in Illinois use either oral medications, insulin or a combination of both to treat and control diabetes.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

5.     Defendants Eli Lilly, Novo Nordisk and Sanofi (collectively, "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in Illinois.

6.     Defendants CVS Caremark, Express Scripts, and OptumRx ("PBM Defendants" or "PBMs") collectively dominate the pricing system for the at-issue drugs.[1] Their dominance results from the reality that these three corporate actors are, at once (1) the largest pharmacy benefit managers in the United States and in Illinois (controlling approximately 80% of the PBM market) and (2) the largest pharmacies in the United States and in Illinois (making up 3 of the top 5 dispensing pharmacies in the U.S.). These PBM conglomerates sit at 4th (CVS Caremark), 5th (OptumRx) and 12th (Express Scripts) on the Fortune 500 list ranking largest corporations by revenue.

7.     As part of their work, PBM Defendants establish standard formulary offerings (i.e., approved drug lists). If a drug is not included on a formulary, then it is not covered by health insurance.

8.     PBM Defendants understand that their standard formulary offerings drive drug utilization.

9.     Because the three PBM Defendants control 80% of the pharmacy benefit market, unless they include a drug on one of their standard formularies, it is not available to 80% of Illinois's citizens.

---

[1] In the context of this Complaint, the "at-issue drugs" are Humulin N, Humulin R, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Apidra, Soliqua, Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

FILED DATE: 12/2/2022 12:33 PM 2022CH11699

10. The Manufacturers likewise understand that PBMs' standard formularies drive drug sales—if Manufacturers want their drugs to be prescribed and paid for they must obtain preferrable formulary position on the PBM Defendants' formularies.

11. Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug prices and drug purchasing behavior.

12. The unfair and deceptive scheme at the root of this Complaint—the Insulin Pricing Scheme—was born from this mutual understanding

13. Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have persistently raised the prices of their respective diabetes drugs in a lockstep manner despite the fact that the cost to produce these drugs has decreased during that same time period.

14. Insulins, which today cost Manufacturer Defendants less than $2 per unit to produce and which were originally priced at $20 per unit when released in the late 1990s, now range between $300 and $700 per unit.

15. In the last decade alone, Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, often down to the decimal point within a few days of each other.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

16.     Figure 1 illustrates the rate in which Defendant Eli Lilly raised the price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

## Figure 1: Price Increase of Insulin vs. Selected Consumer Goods
## from 1997-2018

### Price Changes (1997-2018)
Selected U.S. Consumer Goods and Services

Insulin (Humalog) 1527%

— All Items

— Food

Housing

— Apparel

— Transportation

— Medical Care Services
— Recreation

— Education

1997     2007     2018

Sources: Bureau of Labor Statistics; Truven Health Analytics

5

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

17.     Remarkably, nothing about these medications has changed; today's $350 insulin is the exact drug Defendants originally sold for $20.

18.     The current unlawfully inflated price stands in stark contrast to insulin's origins: the discoverers sold the original patent for $1 to ensure that the medication would remain affordable. Today, insulin has become the poster child for skyrocketing and inflated drug prices.

19.     Both Manufacturer and PBM Defendants play vital roles and profit immensely from the Insulin Pricing Scheme and the artificially inflated prices produced by it.

20.     Specifically, the Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their list prices, and then pay a significant, yet undisclosed, portion of that price back to the PBMs. These Manufacturer Payments[2] are provided under a variety of labels, yet, however they are

---

[2] In the context of this Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates, and any other form of consideration exchanged. This broad definition is necessary because PBMs historically have continued to change and evolve the nature of their payment streams to avoid disclosure to clients and disclosure pursuant to state transparency laws. While the route by which the payment streams reach the PBMs has evolved, the fact that the payments do, in fact, reach the PBMs has remained the same.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

described, these Manufacturer Payments, along with the inflated list prices, are *quid pro quo* for formulary inclusion on the PBMs' standard offerings.

21.     The list prices for the at-issue drugs have become so untethered from the net prices[3] realized by the Manufacturers as to constitute a false price.

22.     PBMs then grant preferred status on their standard formularies based upon the largest Manufacturer Payment and the highest inflated list price—which the PBMs know to be artificially inflated and which the PBMs insist that their health plan payor clients use as the basis for the price they pay for the at-issue drugs.

23.     The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. Manufacturer Defendants are able to make these undisclosed Manufacturer Payments to buy preferred formulary position—which significantly increases their revenue—without sacrificing their profits.

24.     PBM Defendants profit off the inflated list prices that result from the scheme in numerous ways, including: (1) retaining a significant—yet undisclosed— percentage of the Manufacturer Payments, either directly or through wholly owned rebate aggregators, (2) using the inflated list price produced by the Insulin Pricing Scheme to generate profits from pharmacies in their networks and (3) relying on those same inflated list prices to drive up the PBMs' profits through their own pharmacies.

25.     Thus, while the PBM Defendants represent both publicly and to their health plan clients that they use their market power to drive down prices for diabetes

---

[3] Net prices refer to the prices received by the Manufacturers after all Manufacturer Payments are subtracted out.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

medications, these representations are patently false and intended to be deceptive and misleading.

26.    Rather, the PBMs are intentionally driving up the price of the at-issue drugs. Indeed, the Manufacturer Payments the PBMs receive in exchange for preferred formulary position, along with the PBMs' actual formulary construction, are directly responsible for the skyrocketing price of the at-issue diabetes medications.

27.    Because the price paid by nearly every diabetic and payor is based upon the artificially inflated list prices generated by Defendants' scheme, the Insulin Pricing Scheme directly harms every diabetic and payor in Illinois who purchase these life-sustaining drugs.

28.    The consequence to Illinois public health and the public fisc from the outrageous price increases caused by the Insulin Pricing Scheme cannot be overstated.

29.    Illinois diabetics have also been overcharged millions of dollars a year in out-of-pocket costs as a result of the Insulin Pricing Scheme.

30.    For Illinois diabetics, the physical, emotional, and financial tolls of paying such excessive prices for diabetes medications is devastating. Unable to afford the drugs their doctors prescribe, many diabetics in Illinois ration or under-dose their insulin, inject expired insulin, reuse needles, and starve themselves to control their blood sugars. This behavior is extremely dangerous and has led to serious complications or even death.

31.    In addition to the immeasurable human costs, the Insulin Pricing Scheme also adds substantial costs to the Illinois health care system by increasing

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

preventable complications. For example, one national model found that all people with diabetes adhering to their diabetes medications would save $8.3 billion in direct medical costs per year by averting one million emergency department visits and 618,000 hospitalizations.

32.    The State shoulders the burden for much of these increased healthcare costs, spending billions of dollars annually in healthcare related costs for diabetes and diabetes-associated complications. The amount the State has spent on diabetes related costs has steadily increased throughout the relevant time period and could grow exponentially in the near future given the high prevalence of prediabetes in Illinois.

33.    Insulin rationing and the resulting otherwise-avoidable health complications caused by the Insulin Pricing Scheme also leads to a loss in productivity and tax revenue, further damaging the State.

34.    The Honorable Kwame Raoul, Attorney General, brings this action on behalf of the State of Illinois to protect the health and economic well-being of the State as a whole and the heath and economic well-being of Illinois residents.

35.    The relevant period for this Complaint is from 2003 continuing through the present.

## II.    PARTIES

### A.    Plaintiff

36.    **Plaintiff, the People of the State of Illinois,** by the Honorable Kwame Raoul, Attorney General of the State of Illinois, is authorized to enforce the provisions of the Illinois Consumer Fraud Act, 815 ILCS 505/7(a).

9

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

37.     By virtue of his office as the chief legal officer for the State of Illinois, Attorney General Raoul works to safeguard, protect and preserve the health, safety, and welfare of the citizens of Illinois. The Attorney General institutes this action to protect the State's sovereign interest in the health, safety and economic wellbeing of its residents and the integrity of its marketplace, including its healthcare system.

**B.      Manufacturer Defendants**

38.     **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

39.     Eli Lilly is registered to do business in Illinois and may be served through its registered agent: National Registered Agents Inc., 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

40.     Eli Lilly holds four active wholesale drug distributor licenses and an active controlled substance drug distribution license in Illinois.

41.     These licenses allow Eli Lilly to manufacture, distribute, and sell its at-issue drugs in Illinois.

42.     In Illinois, Eli Lilly promotes and distributes several at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

43.     Eli Lilly's global revenues in 2019 were $4.13 billion from Trulicity, $2.82 billion from Humalog, $1.29 billion from Humulin, and $1.11 billion from Basaglar.

44.     Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

45.     Eli Lilly transacts business in Illinois including relating to its at-issue diabetes medications.

46.     Eli Lilly employs sales representatives throughout Illinois to promote and sell Humulin N, Humulin R, Humalog, Trulicity and Basaglar.

47.     Eli Lilly also directs advertising and informational materials to Illinois physicians, payors, pharmacies, and diabetics for the specific purpose of selling more of the at-issue drugs in Illinois and profiting from the Insulin Pricing Scheme.

48.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Illinois with the express knowledge that Illinois diabetics' and payors' payments and reimbursements would be based on those prices.

49.     During the relevant time period, diabetics in Illinois spent millions of dollars per year out of pocket on Eli Lilly's at-issue drugs also based on Eli Lilly's artificially inflated list prices.

50.     Illinois diabetics and payors paid for all of the Eli Lilly diabetes medications related to the at-issue drug transactions in Illinois based on the specific inflated list prices Eli Lilly caused to be published in Illinois in furtherance of the Insulin Pricing Scheme.

51.     **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

11

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

52.     Sanofi may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

53.     Sanofi holds three active wholesale drug distributor licenses and an active controlled substance drug distribution license in Illinois.

54.     These licenses allow Sanofi to manufacture, distribute, and sell its at-issue drugs in Illinois.

55.     Sanofi promotes and distributes pharmaceutical drugs in Illinois, including several at-issue diabetes medications: Lantus, Toujeo, Soliqua, and Apidra.

56.     Sanofi's global revenues in 2019 were $3.50 billion from Lantus and $1.03 billion from Toujeo, $400 million from Apidra, and $144 million from Soliqua.

57.     Sanofi's global revenues in 2018 were $3.9 billion from Lantus, $923 million from Toujeo, $389 million from Apidra, and $86 million from Soliqua.

58.     Sanofi transacts business in Illinois including relating to its at-issue diabetes medications.

59.     Sanofi employs sales representatives throughout Illinois to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

60.     Sanofi also directs advertising and informational materials to Illinois physicians, payors, pharmacies, and diabetics for the specific purpose of selling more of the at-issue drugs in Illinois and profiting from the Insulin Pricing Scheme.

61.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Illinois with the express knowledge that

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

payment and reimbursement by Illinois diabetics and payors would be based on these prices.

62.    During the relevant time period, diabetics in Illinois spent millions of dollars per year out of pocket on Sanofi's at-issue drugs also based on Sanofi's artificially inflated list prices.

63.    Illinois diabetics and payors paid for all of the Sanofi diabetes medications related to the at-issue drug transactions in Illinois based on the specific inflated prices Sanofi caused to be published in Illinois in furtherance of the Insulin Pricing Scheme.

64.    **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

65.    Novo Nordisk is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

66.    Novo Nordisk promotes and distributes pharmaceutical drugs in Illinois, including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

67.    Novo Nordisk's global revenues in 2019 were $2.89 billion from Novolog, $973 million from Levemir, $968 million from Tresiba, $2.29 billion from Victoza, and $1.17 billion from Ozempic.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

68. Novo Nordisk's global revenues in 2018 were $4.19 billion from Novolog, $1.66 billion from Levemir, $1.19 billion from Tresiba, $3.61 billion from Victoza, and $185 million from Ozempic.

69. Novo Nordisk transacts business in Illinois including relating to its at-issue diabetes medications.

70. Novo Nordisk employs sales representatives throughout Illinois to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

71. Novo Nordisk also directs advertising and informational materials to Illinois physicians, payors, pharmacies, and diabetics for the specific purpose of selling more of the at-issue drugs in Illinois and profiting from the Insulin Pricing Scheme.

72. At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Illinois with the express knowledge that Illinois diabetics and payors paid for the at-issue drugs based on these prices.

73. During the relevant time period, diabetics in Illinois spent millions of dollars per year out of pocket on Novo Nordisk's at-issue drugs also based on Novo Nordisk's artificially inflated list prices.

74. Illinois diabetics and payors paid for all of the Novo Nordisk diabetes medications related to the at-issue drug transactions in Illinois based on the specific inflated prices Sanofi caused to be published in Illinois in furtherance of the Insulin Pricing Scheme.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

75.     Collectively, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to as "Manufacturer Defendants" or "Manufacturers."

**C.     PBM Defendants**

76.     **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout the United States and Illinois.

77.     CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

78.     CVS Health, through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and Chief Communication Officers, is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims.

79.     During the relevant time, CVS Health (or its predecessor)[4] has repeatedly, continuously, and explicitly stated that *CVS Health:*

- "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes;"[5]

---

[4] Until 2014, CVS Health was known as "CVS Caremark."  In September 2014, "CVS Caremark Corporation announced that it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."

[5] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

FILED DATE: 12/2/2022 12:33 PM    2022CH11689

- "negotiate[s] with pharmaceutical companies to obtain discounted acquisition costs for many of the products on [CVS Health's] drug lists, and these negotiated discounts enable [CVS Health] to offer reduced costs to clients;"[6]

- "utilize[s] an independent panel of doctors, pharmacists and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on [CVS Health's] drug lists."[7]

80.    CVS Health publicly represents that CVS Health constructs programs that lower the cost of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including Illinois, stating:

> "*CVS Health* introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).

81.    In 2017, CVS Health stated that "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

82.    Throughout the relevant time period, the Manufacturer Defendants directly engaged with CVS Health executives in furtherance of the Insulin Pricing Scheme. Each Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with CVS Health.

---

[6] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2013).
[7] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

83.    Manufacturer Defendants have explicitly recognized that effectuating the Insulin Pricing Scheme requires "intimacy and connect[ion]" between the Manufacturer Defendants' leaders and CVS Health's leaders in order to align on "strategic formulary management initiatives to ensure profitable access across all [standard] formularies."

84.    On a regular basis throughout the relevant period, the Manufacturer Defendants' executive teams—which at times included their CEOs—met with CVS Health executives to discuss their coordinated efforts related to the at-issue drugs. Examples include:

- In at least 2011, 2012, 2014, and 2016, the leaders of CVS Health and Novo Nordisk participated in executive exchange meetings in furtherance of the Insulin Pricing Scheme. These meetings included the Executive Vice President of CVS Health, the Chief Medical Officer of CVS Health, members of CVS Health's Enterprise Operating Committee, and key executives from Novo Nordisk.

- In at least 2012, 2013, and 2017, the leaders of CVS Health and Eli Lilly participated in numerous executive meetings in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of CVS Health, the COO of CVS Health, members of CVS Health's Enterprise Operating Committee, the President of Eli Lilly, and the Senior Vice President of Managed Care at Eli Lilly, among others.

- In at least 2012 and 2016, the leaders of CVS Health and Sanofi participated in executive meetings which included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of CVS Health, the COO of CVS Health and members of CVS Health's Enterprise Operating Committee, among others.

85.    In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, mail order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM and the pharmacies utilized by approximately 40 million Aetna members in the

17

United States and in Illinois. CVS Health controls the entire drug pricing chain for these 40 million Americans.

86. **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

87. CVS Pharmacy owns and operates hundreds of pharmacies throughout Illinois that are directly involved in and profit from the Insulin Pricing Scheme.

88. In its capacity as a retail pharmacy, CVS Pharmacy, working in conjunction with its corporate affiliate entities, knowingly assisted the CVS Health family in profiting from the artificially inflated list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price generated by the Insulin Pricing Scheme), and the amounts received from payors (which amounts were based on the artificially inflated list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

89. CVS Pharmacy is the immediate and direct parent of Defendant Caremark Rx, L.L.C.

90. CVS Pharmacy is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

18

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

91.     During the relevant time period, CVS Pharmacy provided retail pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme, which damaged Illinois diabetics and the State.

92.     **Defendant Caremark Rx, L.L.C.** is a Delaware limited liability company and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

93.     Caremark Rx, L.L.C. is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

94.     Caremark Rx, L.L.C. is a wholly owned subsidiary of Defendant CVS Pharmacy.

95.     During the relevant time period, Caremark Rx, L.L.C. provided PBM and mail order pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Illinois.

96.     **Defendant Caremark L.L.C.** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, L.L.C. is a wholly owned subsidiary of Caremark Rx, L.L.C.

97.     Caremark, L.L.C. is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

98.     Caremark, L.L.C. holds an active pharmacy benefit manager license, an active third party administrator license, an active third party prescription program

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

license, an active wholesale drug distributor license, four active pharmacy licenses, and three active controlled substance licenses in Illinois.

99.    During the relevant time period, Caremark, L.L.C. provided PBM and mail order pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme, which damaged diabetics and payors in Illinois.

100.    **Defendant CaremarkPCS Health, L.L.C.** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health, L.L.C.

101.    CaremarkPCS Health, L.L.C. provides pharmacy benefit management services.

102.    CaremarkPCS Health, L.L.C. is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

103.    CaremarkPCS Health, L.L.C. holds an active pharmacy benefit manager license, an active third party administrator license, and an active third party prescription program license in Illinois.

104.    During the relevant time period, CaremarkPCS Health, L.L.C. provided PBM services in Illinois, which gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Illinois, including the State.

105.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, L.L.C., CVS Pharmacy, and CVS Health are directly

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

involved in the conduct of and control CaremarkPCS Health, L.L.C.'s and Caremark, L.L.C.'s operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail order and retail pharmacy services to the ultimate detriment of diabetics and payors in Illinois. For example:

- During the relevant time period, these parent and subsidiaries have had common officers and directors. Examples include:

  - Thomas S. Moffatt was Vice President and Secretary of Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and Caremark, L.L.C at the same time he was a Vice President, Assistant Secretary, and Assistant General Counsel at CVS Health and Director, Vice President, and Secretary at CVS Pharmacy;

  - Melanie K. Luker was the Assistant Secretary of CVS Pharmacy, Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and Caremark, L.L.C. at the same time she was a Senior Manager of Corporate Services at CVS Health;

  - Jonathan C. Roberts was an Executive Vice President and Chief Operating Officer at CVS Health at the same time he was CEO of Caremark Rx, L.L.C.;

  - Daniel P. Davison was the President of CaremarkPCS Health. L.L.C. at the same time he was a Senior Vice President at CVS Health;

  - Annie E. Klis was a Vice President at CVS Health at the same time she was CEO of Caremark, L.L.C

- CVS Health directly or indirectly owns all the stock of CVS Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C. and CaremarkPCS Health L.L.C.

- All of the executives of CaremarkPCS Health, L.L.C., Caremark, L.L.C., Caremark Rx, L.L.C., and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

- CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents, and statements of CVS Health

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

presents its subsidiaries, including CVS Pharmacy, CaremarkPCS Health, L.L.C., Caremark, L.L.C., and Caremark Rx, L.L.C. as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint. The CVS Health enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

106. Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C., and CaremarkPCS Health, L.L.C, including all predecessor and successor entities, are referred to as "CVS Caremark."

107. CVS Caremark is named as a Defendant in its capacities as a PBM and retail and mail order pharmacy.

108. In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially inflated list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

109. CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market. CVS Caremark's pharmacy services segment generated $141.5 billion in total revenues last year.

110. At all times relevant hereto, CVS Caremark offered pharmacy benefit services to Illinois payors, and derived substantial revenue therefrom, and, in doing so, made the at-issue misrepresentations (discussed below) and utilized the artificially

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

inflated prices generated by the Insulin Pricing Scheme to profit off Illinois diabetics and payors.

111.  At all times relevant hereto, CVS Caremark constructed standard formularies that are used nationwide, including by diabetics and CVS Caremark's payor clients in Illinois and that are relied on by residents in Illinois with diabetes as promoting diabetic health and lowering the price of the at-issue drugs. During the relevant time period, these standard formularies included drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications.

112.  At all times relevant hereto, and contrary to all its express representations, CVS Caremark has knowingly insisted that diabetics and its payor clients, including in Illinois, use the artificially inflated list prices produced by the Insulin Pricing Scheme as the basis for payment for the price paid for the at-issue drugs.

113.  At all times relevant hereto, CVS Caremark has concealed its critical role in the generation of those artificially inflated list prices.

114.  During the relevant time period, CVS Caremark provided PBM services to the State. In doing so, CVS Caremark set the price paid by the State for the at-issue drugs utilizing the artificially inflated prices generated by the Insulin Pricing Scheme. The State also paid CVS Caremark for the at-issue drugs.

115.  In its capacity as a mail order and retail pharmacy, CVS Caremark dispensed the at-issue drugs to Illinois diabetics and received payments from Illinois

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

diabetics and payors based on the artificially inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Illinois diabetics and payors.

116.  During the relevant time period, CVS Caremark provided the at-issue PBM and pharmacy services to the State's health plan. In doing so, CVS Caremark dispensed the at-issue drugs to the State's health plan beneficiaries.

117.  CVS Caremark purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail order and retail pharmacies.

118.  At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid to CVS Caremark and placement on CVS Caremark's standard formularies, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order and retail pharmacies, including those located in Illinois.

119.  **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[8]

120.  Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

---

[8] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc and Express Scripts Holding Company.

24

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

121. Evernorth, through its executives and employees is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme. For example, during the relevant time period Evernorth's CEO Tim Wentworth was involved in communications with the Manufacturer Defendants related to the at-issue drugs and at-issue Manufacturer Payments in furtherance of the Insulin Pricing Scheme.

122. Evernorth's conduct has had a direct effect in Illinois and damaged diabetics and payors in Illinois.

123. On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

124. Throughout the relevant time period, the Manufacturer Defendants directly engaged with Evernorth executives in furtherance of the Insulin Pricing Scheme. Each Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with Evernorth.

125. Manufacturers recognize that effectuating the Insulin Pricing Scheme requires "enhanced relationships at C Suite level" between the Manufacturers and Evernorth to "[i]mprove diabetes patient management through collaboration" and to "work synergistically within [Manufacturer Defendants] to maximize [Evernorth's] business opportunities."

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

126.   On a regular basis throughout the relevant time period, these Manufacturer executive teams—which at times include the CEOs from these companies—met with Evernorth to discuss their coordinated efforts related to the at-issue drugs. Examples include:

- In at least 2013, 2014, 2015, 2017, and 2018, the leaders of Evernorth and Eli Lilly participated in executive meetings in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of Evernorth, Senior Director of Express Scripts, CEO of Eli Lilly, Head of Eli Lilly's diabetes division, among others.

- In at least 2013, 2014, and 2016, the leaders of Evernorth and Novo Nordisk participated in executive meetings in furtherance of the Insulin Pricing Scheme.

- In at least 2014, 2015, 2016, and 2017 the leaders of Evernorth and Sanofi participated in "Customer Exchange" and PCMA executive meetings, which included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the Chairman and CEO of Evernorth, the former President and current CEO, the Global CEO of Sanofi and Chief Medical Officer of Sanofi, among others.

127.   Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Illinois, which engaged in the activities that gave rise to this Complaint.

128.   In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM and mail order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM and the mail order pharmacies utilized by approximately 15 million Cigna members in the United States and in Illinois. Evernorth controls the entire drug pricing chain for these 15 million Americans.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

129.  In each annual report for at least the last decade, Evernorth has repeatedly, continuously, and explicitly stated:[9]

- "[Evernorth] is one of the largest PBMs in North America . . . [and Evernorth] help[s] health benefit providers address access and affordability concerns resulting from rising drug costs while helping to improve healthcare outcomes."

- "[Evernorth] manage[s] the cost of the drug benefit by . . . assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist[ing] clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors [and better care for members] leveraging purchasing volume to deliver discounts to health benefit providers."

- "[Evernorth] works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes."

130.  **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

131.  Express Scripts, Inc. is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

132.  Express Scripts, Inc. holds an active license as a third party prescription program and an active license as a business entity producer in Illinois.

---

[9] Express Scripts Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

133.   Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Illinois that engaged in the conduct, which gave rise to this Complaint.

134.   During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order pharmacy services, which gave rise to the Insulin Pricing Scheme and damaged diabetics, the State, and payors in Illinois.

135.   **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

136.   Express Scripts Administrators, LLC is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

137.   Express Scripts Administrators, LLC holds an active pharmacy benefit manager license, an active third-party administrator license, and an active third-party prescription program license in Illinois.

138.   During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Illinois discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damaged diabetics, the State, and payors in Illinois.

139.   **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

140.   Medco is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604

141.   Prior to 2012, Medco provided the at-issue PBM and mail order services in Illinois, which gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Illinois.

142.   In 2012, Express Scripts acquired Medco for $29 billion.

143.   Prior to the merger Express Scripts and Medco were two of the largest PBMs in the United States and in Illinois.

144.   Prior to the merger, Medco provided the at-issue PBM and mail-order services in Illinois, which gave rise to the Insulin Pricing Scheme and damaged diabetic Illinois residents and the State.

145.   Following the merger, all of Medco's PBM and mail order pharmacy functions were combined into Express Scripts.  The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

146.   At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then CEO of Medco, David B Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined

entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."

147. The then-CEO of Express Scripts, George Paz, during a Congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."

148. **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

149. ESI Mail Pharmacy Service, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

150. ESI Mail Pharmacy Service, Inc. holds six active pharmacy licenses and two active controlled substances licenses in Illinois.

151. During the relevant time period, ESI Mail Pharmacy Service provided the mail order pharmacy services in Illinois discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Illinois.

152. **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

153. Express Scripts Pharmacy, Inc. is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

154. Express Scripts Pharmacy, Inc. holds six active pharmacy licenses and five active controlled substance licenses in Illinois.

155. During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in Illinois discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Illinois.

156. As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. are directly involved in the conduct of and control Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail order pharmacy services to the ultimate detriment of Illinois diabetics, payors, and the State. For example:

- During the relevant time period, these parent and subsidiaries have had common officers and directors:

  - Officers and/or directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Secretary; Timothy Smith, Vice President; and Scott Lambert, Treasury Manager Director;

  - Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips,

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

Chief Financial Officer; and Priscilla Duncan, Associate Secretary;

- Officers and/or directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Secretary; and Joanne Hart, Associate Treasurer;

- Officers and/or directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Secretary; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer; and

- Officers and/or directors that have been shared between Medco Health Solutions, Inc. and Evernorth include David Queller, President and Senior VP of Sales & Accounting, Christine Houston, VP and COO, Timothy Smith, VP and Treasurer and all of the officers of Medco Health Solutions are also officers of Express Scripts, Inc.

• Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

• The Evernorth corporate family does not operate as separate entities. The public filings, documents, and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

• All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

- As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. that gave rise to the State's claims in this Complaint.

157.   Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc. Medco Health Solutions, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

158.   Express Scripts is named as a Defendant in its capacities as a PBM and mail order pharmacy.

159.   In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially inflated list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Script's formularies.

160.   Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States.

161.   Express Scripts has only grown larger since the Cigna merger.

162.   In 2017, annual revenue for Express Scripts was over $100 billion.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

163.    As of December 31, 2018, more than 68,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.

164.    At all times relevant hereto, Express Scripts offered pharmacy benefit services, and derived substantial revenue therefrom, in Illinois and provided the at-issue PBM services to numerous payors in Illinois.

165.    At all times relevant hereto, and contrary to all of their express representations, Express Scripts has knowingly insisted that its payor clients, including those in Illinois, use the artificially inflated list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

166.    At all times relevant hereto, Express Scripts has concealed its critical role in the generation of those artificially inflated list prices.

167.    At all times relevant hereto, Express Scripts constructed standard formularies that are used nationwide, including by diabetics and Express Scripts' payor clients in Illinois, and that are relied on by residents in Illinois with diabetes as promoting diabetic health and lowering the price of the at-issue drugs. During the relevant time period, these standard formularies included the at-issue diabetes medications.

168.    During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

released by the U.S. Senate in conjunction with its January 2021 report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" ("January 2021 Senate Insulin Report"), Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (who later would become part of Express Scripts).

169. During the relevant time period, Express Scripts provided PBM services to the State. In doing so, Express Scripts set the price paid by the State for the at-issue drugs utilizing the artificially inflated prices generated by the Insulin Pricing Scheme. The State also paid Express Scripts for the at-issue drugs.

170. In its capacity as a mail order pharmacy, Express Scripts dispensed the at-issue drugs to Illinois diabetics and received payments from Illinois diabetics and payors based on the artificially inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Illinois diabetics and payors.

171. During the relevant time period, Express Scripts provided the at-issue PBM and pharmacy services to the State's health plan. In doing so, Express Scripts dispensed the at-issue drugs to the State's health plan beneficiaries.

172. At all times relevant hereto, Express Scripts derived substantial revenue providing mail order pharmacy services in Illinois.

173. Express Scripts purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail order pharmacies.

35

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

174.    At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid to Express Scripts and placement on Express Scripts' standard formularies, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' mail order and retail pharmacies, including those located in Illinois.

175.    **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

176.    UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

177.    UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2015, UnitedHealth Group listed revenue in excess of $257 billion, and the company is currently ranked fifth on the Fortune 500 list. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans and pharmacy benefits through its wholly-owned subsidiaries.

178.    More than one-third of the overall revenues of UnitedHealth Group come from OptumRx.

179.    UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin

36

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

Pricing Scheme. For example, executives of UnitedHealth Group structure, analyze, and direct the company's overarching, enterprise-wide policies, including PBM and mail-order services, as a means of maximizing profits across the corporate family.

180.   UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

181.   On a regular basis throughout the relevant time period, executive teams from each Manufacturer Defendant—including at times their CEOs—met with executives from UnitedHealth Group to discuss their coordinated efforts in furtherance of the Insulin Pricing Scheme. Examples include:

- In at least in 2010, 2016, 2017, and 2018, executives from UHG, including CEOs, the Executive Vice President of Corporate Affairs, Senior Directors of Diabetes Alliance, CEOs of OptumRx, and the Executive Vice President of OptumRx, met and/or engaged in discussions with executives at Eli Lilly, including CEO Dave Ricks, that included discussions related to the Insulin Pricing Scheme.

- In 2014, the CEO and Senior Vice President of UHG met with executives at Novo Nordisk and engaged in discussions, including involving topics that related to the Insulin Pricing Scheme.

- In at least 2014 and 2018, executives at UnitedHealth Group, including CEOs, met with executives at Sanofi, including CEO of Sanofi to engage in discussions, including involving topics that related to the Insulin Pricing Scheme. Sanofi's stated objective for these meetings was

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

to "[l]everage the entire Sanofi portfolio of assets to set the stage for future business development with UHG, along with establishing a stronger executive level strategic relationship with UHG."

182. In 2011, UHG invested significantly in building out OptumRx's capabilities. This included UHG forming an enterprise wide UHG Pharmacy Steering Committee to oversee all UHG-related formularies, including OptumRx, with the goal of aligning 90% of their formularies/PDLs across all their segments (Medicare, commercial and managed care) and moving to one P&T committee in 2012. This effort also included tasking OptumRx with negotiating rebates and manufacturer contracts for all UHG enterprise-wide formularies.

183. UnitedHealth Group's conduct had a direct effect in Illinois and damaged diabetics and payors in Illinois and the State.

184. **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

185. OptumInsight, Inc. is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

186. OptumInsight, Inc. holds an active Third Party Administrator License in Illinois.

187. During the relevant time period, due to name changes and mergers, a number of different entities made up what is now known as OptumInsight, including Ingenix, Innovus, i3, QualityMetric, Htanalytics, ChinaGate, CanReg, and the Lewin Group. For the purposes of this Complaint, "OptumInsight" refers to each of these entities.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

188. OptumInsight is an integral part of the Insulin Pricing Scheme and during the relevant time period OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise Defendants with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

189. For example, during the relevant time period OptumInsight provided Illinois specific data to the Manufacturers related to at-issue drugs, including which Illinois pharmacies sold the most of these diabetic products. The Manufacturers used this data to move shares of their diabetes medications.

190. Each Manufacturer Defendant had dedicated executives assigned to OptumInsight for the purpose of collaborating with key executives and coordinating with OptumInsight for data acquisition and utilization.

191. The Manufacturers utilized their relationships with OptumInsight to deepen their ties to the overall UnitedHealth Group corporate family and to secure formulary wins for their diabetes medications.

192. Each Manufacturer Defendant also contracted with OptumInsight during the relevant time period to engage in partnerships targeting diabetics, including in Illinois.

193. OptumInsight was paid tens of millions of dollars for claims analytical services it provided in Illinois during the relevant time period, including related to the at-issue drugs.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

194.   **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

195.   OptumRx is registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

196.   OptumRx holds an active pharmacy benefit manager license (License No. 100317588), an active third party administrator license, an active third party prescription program license, two active pharmacy licenses, and two active controlled substance licenses in Illinois.

197.   As a result of numerous interlocking directorships and shared executives, UnitedHealth Group is directly involved in the conduct and control of OptumInsight and OptumRx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Illinois diabetics and payors, including the State. For example:

- These parent and subsidiaries have common officers and directors, including:

  - Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;

  - Dan Schumacher is president of Optum, Inc, the Chief Strategy and Growth Officer at UnitedHealth Group, Inc. and oversees OptumInsight;

  - Terry Clark is a senior vice president and chief marketing officer at UnitedHealth Group and also oversees the branding, marketing, and advertising for UnitedHealth Group and Optum, Inc.;

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

- Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;

- Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and also Assistant Secretary at OptumRx, Inc.;

- Peter Gill is Vice President at UnitedHealth Group, Inc. and also Treasurer at OptumRx, Inc.;

- John Santelli leads Optum Technology, the leading technology division of Optum, Inc serving the broad customer base of Optum and UnitedHealthcare and also serves as UnitedHealth Group's chief information officer;

- Eric Murphy is the Chief Growth and Commercial Officer for Optum, Inc. and has also led OptumInsight, Inc.

- Timothy Wicks, CFO and Executive Vice President of Industry and Network relations for OptumRx, Inc. also held "executive management positions" with UnitedHealth Group "including operations product management and business development roles at UnitedHealthcare, OptumInsight and most recently, Optum Shared Services."

- UnitedHealth Group directly or indirectly owns all the stock of OptumRx, Inc. and OptumInsight, Inc.

- The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group presents its subsidiaries, including OptumRx, Inc. and OptumInsight as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The UnitedHealth Group enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

- All the executives of OptumRx, Inc. and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth Group.

- As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of OptumRx, Inc. and OptumInsight that gave rise to the State's claims in this Complaint.

198.   Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., and OptumInsight, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

199.   OptumRx is named as a Defendant in its capacities as a PBM and mail order pharmacy.

200.   In its capacity as a PBM, OptumRx coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially inflated list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on OptumRx's drug formularies.

201.   OptumRx provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

202.   In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with a revenue of $74 billion.

203.   Prior to 2011, OptumRx was known as Prescription Solutions. In addition, as illustrated in Figure 13, OptumRx rose to power through numerous mergers with other PBMs. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this OptumRx's parent company, UnitedHealth Group, bought Catamaran Corp in a deal worth $12.8 billion and merged Catamaran with OptumRx.

204.    Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail order activities.

205.    At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Illinois.

206.    At all times relevant hereto, and contrary to all their express representations, OptumRx has knowingly insisted that diabetics and its payor clients, including its payor clients in Illinois, use the artificially inflated list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

207.    At all times relevant hereto, OptumRx has concealed its critical role in the generation of those artificially inflated list prices.

208.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and constructed standard formularies that are used throughout Illinois by payors and diabetics, and that are relied on by residents in Illinois with diabetes as promoting diabetic health and lowering the price of the at-issue drugs. During the relevant time period, these standard formularies included the at-issue diabetes medications.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

209. In its capacity as a mail order pharmacy, OptumRx dispensed the at-issue drugs to Illinois diabetics and received payments from Illinois diabetics and payors based on the artificially inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Illinois diabetics and payors.

210. At all times relevant hereto, OptumRx purchased drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, and dispensed the at-issue medications to diabetics in Illinois through its mail order pharmacies.

211. At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies.

212. Collectively, CVS Caremark, OptumRx, and Express Scripts are referred to as "PBM Defendants" or "PBMs."

213. Collectively, the "PBM Defendants" and the "Manufacturer Defendants" are referred to as "Defendants."

### III.   PUBLIC INTEREST

214. The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this action pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois common law.

215. This action seeks, on behalf of the State of Illinois and its citizens, equitable relief to redress injury in addition to injunctive relief seeking an end to Defendants' misconduct.

44

## IV.  JURISDICTION AND VENUE

216.  This action is brought for and on behalf of the State of Illinois, by the State of Illinois, by Kwame Raoul, Illinois Attorney General, pursuant to the provisions of the Consumer Fraud and Deceptive Business Practices Act and his common law authority as Attorney General to represent the State of Illinois and the people of Illinois.

217.  This Court has personal jurisdiction over each Defendant pursuant to 735 ILCS 5/2-209. Each Defendant: (a) transacts business and/or is admitted to do business within Illinois, (b) maintains substantial contacts in Illinois, and (c) committed the violations of Illinois statutes and the common law in whole or part within Illinois. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of, causing injury to persons residing in, located in, or doing business in Illinois, and to the State.

218.  All of the at-issue transactions occurred in Illinois and/or involved Illinois residents.

219.  Venue for this action properly lies in Cook County, Illinois pursuant to Section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that the transaction or some part thereof which gave rise to this action occurred in Cook County.

45

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

## V. FACTUAL ALLEGATIONS

### A. Diabetes and Insulin Therapy

#### 1. Diabetes: A growing epidemic

220. Diabetes is a disease that occurs when a person's blood glucose, also called blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the blood. When there is not enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, that can cause serious health problems, such as heart disease, vision loss, and kidney disease.

221. There are two basic types of diabetes. Roughly 90-95% of diabetics developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as Type 2, this form of diabetes is often developed later in life. While Type 2 patients can initially be treated with tablets, in the long term most patients have to switch to insulin injections.

222. Type 1 diabetes occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.

223. Insulin treatments are a necessary part of life for those who have diabetes and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.

46

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

224.   The number of Americans with diabetes has exploded in the last half century.  In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over ten (10) million.  Fourteen (14) years later, the count tripled again. Now over thirty (30) million people—9.4% of the country—live with the disease.

225.   Likewise, the prevalence of diabetes in Illinois has been steadily increasing as well, over 1.3 Illinois adults now live with diabetes and another 3.6 million have prediabetes.

226.   The burden of diabetes is not equally distributed in Illinois. Diabetes is significantly more prevalent in impoverished regions; nearly 1 in 4 diabetics in Illinois who earn less than $25,000 a year have diabetes.

227.   Minority communities are also disproportionally affected by this disease— nearly 20% of Black Illinois residents have diabetes.

2.   Insulin: A century old drug

228.   Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the health complications associated with the disease are avoidable.

229.   Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

230.   In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent of

$14 today), explaining "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."

231. After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

232. Although early iterations of insulin were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.

233. While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

234. Over a decade later, Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.

235. Analog insulin is laboratory grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

236.   Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

237.   Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

238.   In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.

239.   In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.

240.   Even though insulin was first extracted nearly one hundred (100) years ago, only Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin in the United States.

241.   Many of the at-issue diabetes medications are now off patent.  However, due in large part to their ability to stifle all competition, Manufacturer Defendants make 99% of the insulins in the market today.

### 3.   Current insulin landscape

242.   While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions whether the overall efficacy of insulin has significantly improved over the last twenty (20) years.

FILED DATE: 12/2/2022 12:33 PM 2022CH11699

243. For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes.

244. A recent study published in the Journal of American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

245. When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.

246. Moreover, all of the insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

247. Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.

248. Nor have the production or research and development costs increased. In fact, in the last ten (10) years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A September 2018 study published in BMJ Global Health calculated that, based on production costs, a

50

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

reasonable price for a year's supply of human insulin is $48 to $71 per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.

249.    Another recent study noted anecdotal evidence that the Manufacturers could be *profitable charging under $2 a vial*. While the study estimated the total cost (including device and cold-chain distribution) to produce a vial of analog insulin was $2.50, the study noted:

> If we are wrong on [the $2.50 cost estimate] it would be by *overestimating* them. In short, [while we calculate] costs are likely around $2.50 pen/vial . . . in discussion with Biocon (a foreign insulin manufacturer) we were told insulin price in India was ~$2/vial and Biocon is "comfortably profitable" at that level. In another discussion we were told Sanofi offered Lantus at under $1.60 in certain emerging markets national tenders.

250.    These figures stand in stark contrast to the $5,705 that a diabetic spent, on average, for insulin in 2016.

251.    Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research—original drug discovery and patient trials—was performed one hundred (100) years ago.

252.    Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, the Manufacturers incurred decades ago.

253.    Today, Manufacturer Defendants only spend a fraction of the billions of dollars in revenue they generate from the at-issue drugs on research and development.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

254. Despite this decrease in production costs and no new research and development, the reported price of insulins has risen astronomically over the last fifteen (15) years.

### 4. Insulin adjuncts: Type 2 medications

255. Over the past decade, Manufacturer Defendants have also released a number of non-insulin medications that help control the level of insulin in the bloodstream of Type 2 diabetics.

256. In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity, in 2016, Sanofi did the same with Soliqua, and in 2017, Novo Nordisk did the same with Ozempic.

257. Victoza, Trulicity, and Ozempic are all medications known as glucagon-like peptide-1 receptor agonists ("GLP-1") and are similar to the GLP-1 hormone that is already produced in the body. Soliqua is a combination long-acting insulin and GLP-1 drug. Each of these drugs can be used in conjunction with insulins to control diabetes.

258. Today, Manufacturer Defendants have a dominant position in the market for all diabetes medications. The following is a list of diabetes medications at issue in this lawsuit:

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

## Table 1: Diabetes medications at issue in this case

| Insulin Type | Action | Name | Company | FDA Approval | Current Price |
|---|---|---|---|---|---|
| *Human* | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | **Humulin R 500** | **Eli Lilly** | 1994 | **$1,784 (vial)** **$689 (pens)** |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| *Analog* | **Rapid-Acting** | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | **Long-Acting** | Lantus | Sanofi | 2000 | $ 340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $ 370 (vial) $ 555 (pens) |
| | | **Basaglar (Kwikpen)** | **Eli Lilly** | 2016 | **$392 (pens)** |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| *Type 2 Medications* | | Trulicity | Eli Lilly | 2014 | $1,013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens) $1,220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1,022 (pens) |
| | | Soliqua | Sanofi | 2016 | $927.90 (pens) |

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

**B.    The Dramatic Rise in the Price of Diabetes Medications**

1.    Insulin price increases

259.    In 2003, PBMs began their rise to power (which will be discussed in greater detail in the next section).

260.    That same year, the price of insulin began its dramatic rise to its current exorbitant level.

261.    Since 2003, the list price of certain insulins has increased in some cases by more than 1000%; an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in this time period.

262.    By 2016, the average price per month of the four most popular types of insulin rose to $450 — and costs continue to rise, so much so that now one in four diabetics are skimping on or skipping lifesaving doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

263.    Since 1997, Defendant Eli Lilly has artificially inflated the list price of a vial of Humulin R (500U/ML) from $165 to $1784 (*See* Figure 2).

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

Figure 2: Rising list prices of Humulin R (500U/mL) from 1997-2021

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

264.    Since 1996, Defendant Eli Lilly has artificially inflated the list price for a package of pens of Humalog from less than $100 to $663 and from less than $50 for a vial to $342 (*See* Figure 3).

**Figure 3: Rising list prices of Humalog vials and pens
from 1996-2021**



265.    Novo Nordisk has also artificially inflated the list prices—from 2006 to 2020, Levemir rose from $162 to $555 for pens and from under $100 to $370 per vial (*See* Figure 4).

**Figure 4: Rising list prices of Levemir from 2006-2021**



FILED DATE: 12/2/2022 12:33 PM    2022CH11699

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

266.    From 2002 to 2020, Novo Nordisk has artificially inflated the list price of Novolog from $108 to $671 for a package of pens and from less than $50 to $347 for a vial (*See* Figure 5).

**Figure 5: Rising list prices of Novolog vials and pens
from 2002-2021**



FILED DATE: 12/2/2022 12:33 PM 2022CH11699

267.    Defendant Sanofi has kept pace as well, artificially inflating the list price for Lantus, the top-selling analog insulin, from less than $200 in 2006, to over $500 in 2020 for a package of pens and from less than $50 to $340 for a vial (*See* Figure 6).

**Figure 6: Rising list prices of Lantus vials and pens
from 2001-2021**



268.    Manufacturer Defendants' non-insulin diabetes medications have experienced similar recent price increases. For example, since 2015 Eli Lilly has artificially inflated the list price of Trulicity almost 50%.

269.    Driven by these price hikes, payors' and diabetics' spending on diabetes medications has skyrocketed with totals in the tens of billions of dollars.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

2.   Manufacturers increased prices in lockstep

270.   The timing of the list price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, they have done so in perfect lockstep.

271.   In thirteen (13) instances since 2009, competitors Sanofi and Novo Nordisk raised the list prices of their insulins, Lantus and Levemir, in tandem, taking the same price increase down to the decimal point within a few days of each other.

272.   This practice of increasing drug prices in lockstep with competitors is known as "shadow pricing" and, as healthcare expert Richard Evans from SSR Health recently stated, "is pretty much a clear signal that your competitor does not intend to price-compete with you."

273.   In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry.

274.   Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7 demonstrates these price increases with respect to Lantus and Levemir. Figure 8 demonstrates this behavior with respect to Novolog and Humalog.

FILED DATE: 12/2/2022 12:33 PM 2022CH11699

**Figure 7: Rising list prices of long-acting insulins**



FILED DATE: 12/2/2022 12:33 PM    2022CH11699

**Figure 8: Rising list prices of rapid-acting insulins**



FILED DATE: 12/2/2022 12:33 PM   2022CH11699

275.   Figure 9 demonstrates this behavior with respect to the human insulins, Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 9: Rising list price increases for human insulins**



276.  Figure 10 demonstrates Defendants' lockstep price increases for their Type 2 drugs, Trulicity, Victoza and Ozempic.

**Figure 10: Rising list prices of Type 2 drugs**



FILED DATE: 12/2/2022 12:33 PM   2022CH11699

277. Figure 11 shows how, collectively, Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison.

**Figure 11: Lockstep insulin price increases**



278. Because of Manufacturer Defendants' collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

### C.    Pharmaceutical Payment and Supply Chain

279. The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers, and patients.

280. Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy and pharmacy to patient or (2) from manufacturer to mail order pharmacy to patient.

65

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

281.   The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is directly tied to manufacturer's list price.

282.   There is no transparency in this pricing system; typically, only a brand drug's list price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available. To note, "Wholesale Acquisition Cost" is not the final price that wholesalers (or any other entity in the pharmaceutical pricing chain) pay for the Manufacturers' drugs. The final price that a wholesaler pays the Manufacturers is less than WAC because of post-purchase discounts.

283.   Drug manufacturers self-report WAC or other prices upon which AWP is based to publishing compendiums such as First DataBank, Redbook and others who then publish that price.

284.   As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used list price in reimbursement and payment calculations and negotiations for both payors and patients.

1.   Drug Costs for Diabetics.

285.   Whether insured or not, all Illinois diabetics pay a substantial part of their diabetic drug costs based on the false list prices generated by the Insulin Pricing Scheme.

66

286. Uninsured diabetic must pay the full, point-of-sale prices (based on the artificially prices generated by the Insulin Pricing Scheme) every time they fill their prescriptions. In Illinois, 9.1% of the population—or 275 thousand Illinois residents are uninsured. Approximately 18% of uninsured Illinois residents are diabetic. As a direct result of the Insulin Pricing Scheme, the prices uninsured Illinois residents pay for the at-issue life-sustaining drugs has skyrocketed over the last fifteen years.

287. The uninsured are not the only patients saddled with high costs. Insured diabetics also often pay a significant portion of a drug's price out-of-pocket including in deductibles, coinsurance requirements, and/or copayment requirements based on the artificially inflated list prices generated by the Insulin Pricing Scheme.

288. Thus, nearly all Illinois diabetics have been damaged by having to pay for diabetes medications out-of-pocket based upon the specific artificially prices generated by the Insulin Pricing Scheme. In many cases, the Illinois diabetics have been priced out of these life-sustaining drugs.

289. In addition, these exorbitant indefensible out-of-pocket costs created by the Insulin Pricing Scheme make it more difficult for patients to adhere to their medications, resulting in avoidable complications and higher overall healthcare costs. An American Diabetes Association working group recently noted that "people with high cost-sharing are less adherent to recommended dosing, which results in short- and long-term harm to their health." The overall economic impact from the loss of productivity and increased healthcare costs that result from diabetics underdosing on their insulin has been deeply damaging to the State.

67

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

### 2.    PBMs' role in the pharmaceutical payment chain

290.    PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 12:

**Figure 12: Insulin distribution and payment chain**



291.    The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that payors pay for prescription drugs and are paid by payors for the drugs utilized by a payor's beneficiaries.

292.    PBMs also contract with a network of retail pharmacies often owned by the PBM. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse pharmacies for the drugs dispensed.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

293.    PBM Defendants also own mail-order, retail and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients.

294.    Often times—including for the at-issue drugs—the PBM Defendants purchase drugs from the Manufacturers and dispense them to the patients.

295.    Even where PBM Defendants' pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the Manufacturers.

296.    In addition, and of particular significance here, PBM Defendants contract with pharmaceutical manufacturers, including Manufacturer Defendants.

297.    These relationships allow PBMs to exert tremendous influence over what drugs are available throughout Illinois and at what prices.

298.    Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In sum:

- PBMs negotiate the price that payors pay for prescription drugs (for the at-issue drugs based on artificially inflated prices generated by the Insulin Pricing Scheme);

- they separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

- they set the amount in fees that the pharmacy pays back to the PBM for each drug sold (for the at-issue drugs based on artificially inflated prices generated by the Insulin Pricing Scheme);

- they set the price paid for each drug sold through their mail order pharmacies (for the at-issue drugs based on artificially inflated prices generated by the Insulin Pricing Scheme); and

- they negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (for the at-issue drugs based on artificially inflated prices generated by the Insulin Pricing Scheme).

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

299.    Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this pricing chain is paying or receiving for the exact same drugs.

300.    In every interaction that PBMs have within the pharmaceutical pricing chain they stand to profit from the artificially prices generated by the Insulin Pricing Scheme.

3.    The rise of the PBMs in the pharmaceutical supply chain

301.    When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger and larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

302.    One of the roles PBMs took on was negotiating with drug manufacturers ostensibly on behalf of payors.

303.    In the early 2000s, PBMs started buying pharmacies.

304.    When a PBM combines with a pharmacy, it has increased incentive to collude with Manufacturers to keep certain prices high.

305.    These perverse incentives still exist today with respect to both retail and mail order pharmacies housed within the PBMs' corporate families.

306.    More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

307.    In total, nearly forty (40) different PBM entities have merged or otherwise been absorbed into what are now the PBM Defendants.

FILED DATE: 12/2/2022 12:33 PM 2022CH11699

308. In addition, each of the PBM Defendants are now owned by other significant players within the pharmaceutical chain: Express Scripts merged with Cigna in a $67 billion-dollar deal, Caremark was bought by the largest pharmacy in the United States, CVS for $21 billion, CVS also now owns Aetna following a $69 billion-dollar deal and OptumRx is owned by the largest health insurance company in the United States, UnitedHealth Group.

309. Figure 13 depicts this consolidation within the PBM market.

### Figure 13: PBM consolidation



310. After merging or acquiring all their competitors and now backed by multi-billion-dollar corporations, PBM Defendants have taken over the market in the

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

past decade—controlling over 80% of the market and managing pharmacy benefits for over 270 million Americans.

311.   Importantly, PBM Defendants have near *complete* control over the Manufacturer Payment market, given that in addition to their own clients (which represent 80% of the market), most smaller pharmacy benefit managers—including the largest pharmacy benefit manager in the United States outside the PBM Defendants, Prime Therapeutics—contract with the PBM Defendants (or their controlled affiliate rebate aggregator companies) to negotiate Manufacturer Payments on their behalf.

312.   Business is booming for PBM Defendants. Together, they report more than $300 billion in annual revenue.

313.   PBMs are able to use the consolidation in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from the Advice and Vision for the Healthcare Ecosystem (ADVI) consulting described this imbalance in power, "it's really difficult to engage in any type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."

4.   Insular nature of the pharmaceutical industry

314.   The insular nature of the PBM and pharmaceutical industry has provided PBM Defendants with ample opportunity for contact and communication

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

amongst themselves, as well as with Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

315.   Each Manufacturer Defendant is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA's meetings and platforms in furtherance of the Insulin Pricing Scheme.

316.   David Ricks, CEO of Eli Lilly, Paul Hudson, CEO of Sanofi and Douglas Langa, Executive Vice President of Novo Nordisk, are all part of the members of the PhRMA board of directors and/or part of the PhRMA executive leadership team.

317.   PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at PBM trade associations and industry conferences.

318.   Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

319.   The current board of the PCMA includes Amy Bricker, President of Express Scripts, Heather Cianfrocco, CEO of OptumRx, and Alan Lotvin, Executive Vice President of CVS Health and President of CVS Caremark. Past board members include John Prince, President and COO of Optum, Inc. (and former CEO of OptumRx); Jon Roberts, Executive Vice President of CVS Health; and Tim Wentworth, CEO of Evernorth.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

320.    All PBM Defendants are members of and, as a result of their leadership positions, control the PCMA. Each Manufacturer Defendant is an affiliate member of this organization.

321.    The PCMA annual conferences appear to be at the center of the Insulin Pricing Scheme.

322.    Every year, high-level representatives and corporate officers from both PBM, including executives from OptumInsight, and Manufacturer Defendants attend these conferences to meet in person to discuss their shared business opportunities within the pharmaceutical industry. Defendants also have used these conferences to engage in private meetings in furtherance of the Insulin Pricing Scheme.

323.    In fact, for at least the last six (6) years, all of the Manufacturer Defendants have been "Presidential Sponsors" of these PBM conferences.

324.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."

325.    From at least 2010-2019, representatives from each Manufacturer Defendant met privately with representatives from each PBM Defendant during both the Annual Meetings and Business Forum conferences that the PCMA held each year.

326.    Prior to these meetings dedicated teams of executives from each Defendant would spend weeks preparing PCMA "pre-reads" and reports in

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

preparation for these meetings. These reports not only demonstrate the deep involvement of each Defendant in the Insulin Pricing Scheme, but they also reflect the tangled web that gave rise to the Scheme.

327. In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community." As PCMA members, PCMA-Connect provides PBM and Manufacturer Defendants with a year-round, non-public online forum to engage in private discussions in furtherance of the Insulin Pricing Scheme.

328. Notably, key at-issue lockstep price increases occurred shortly after the Defendants met at PCMA meetings. For example, on September 26 and 27, 2017 the PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Several days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. A few weeks later Novo Nordisk recommended that the company make a 4% list price increase on January 1, 2018 to match the Sanofi increase, which was approved Nov 3, 2017.

329. Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi took its list price increase on Lantus and this occurred only a few weeks after a PCMA spring conference in Washington DC attended by representatives from all the PBM Defendants.

330. Further, the PBMs control the PCMA and have weaponized it to further their interests and to hide the Insulin Pricing Scheme. The PCMA has brought

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

numerous lawsuits and lobbying campaigns aimed at blocking drug pricing transparency efforts, including recently suing the Department of Health and Human Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them to direct-to-consumer discounts.

### D.     The Insulin Pricing Scheme

331.    The market for the at-issue diabetes medications is unique in that it is highly concentrated with, until recently, little to no generic/biosimilar options and the drugs have similar efficacy and risk profiles.  In fact, PBMs treat the at-issue drugs as commodity products in constructing their formularies.

332.    In such a market, where manufacturing costs have significantly decreased, PBMs should have great leverage in negotiating with the Manufacturer Defendants to drive prices down in exchange for formulary placement.

333.    But the PBMs do not want the prices for diabetes medications to go down because they make more money on higher prices. So do the Manufacturers.

334.    As a result, Defendants have found a way to game the system for their mutual benefit—the Insulin Pricing Scheme.

335.    PBM Defendants' formularies are at the center of the Insulin Pricing Scheme. Given the asymmetry of information and disparity in market power between payors and PBM Defendants and the costs associated with making formulary changes, most payors accept the standard formularies offered by the PBMs.

336.    Manufacturer Defendants recognize that because PBM Defendants have such a dominant market share, if they chose to exclude a particular diabetes

medication from their standard formularies, or give it a non-preferred position, it could mean billions of dollars in profit loss for Manufacturer Defendants.

337.    For example, Olivier Brandicourt, Sanofi's Chief Executive Officer, in a recent interviewed stressed the importance of the PBMs' standard formularies: "if you look at the way [CVS Caremark] is organized in the U.S . . . 15 million [lives] are part of [CVS Caremark's standard] formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's standard formulary] we wouldn't have access to those 15 million lives."

338.    Manufacturer Defendants also recognize that the PBM Defendants profits are directly tied to the Manufacturers' list prices. For example, the January 2021 Senate Insulin Report noted this in summarizing the internal documents produced by the Manufacturers:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price . . . In other words, the drug makers were aware that higher list prices meant higher revenue for PBMs.

339.    The documents released by the Senate contemporaneous with the January 2021 Senate Insulin Report further corroborate the degree to which the Manufacturers' pricing strategy is focused on the PBMs' profitability. In an internal August 6, 2015 email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug in order to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

> concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.

340.    Because the Manufacturer Defendants know that—contrary to their public representations—PBM Defendants make more money from *increasing* prices, over the course of the last fifteen years and working in coordination with the PBMs, the Manufacturers have artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBMs.

341.    During the last fifteen years the amount of Manufacturer Payments paid to the PBMs has increased substantially. For example, the January 2021 Senate Insulin Report found that:

> In July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred formulary placement. Similarly, rebates to Express Scripts and OptumRx increased dramatically between 2013 and 2019 for long-acting insulins. For example, in 2019, Sanofi offered OptumRx rebates up to 79.75% for Lantus for preferred formulary placement on their client's commercial formulary, compared to just 42% in 2015. Similarly, Novo Nordisk offered Express Scripts rebates up to 47% for Levemir for preferred formulary placement on their client's commercial formulary, compared to 25% in 2014.

342.    Beyond increased rebate demands, the PBMs have also requested and received larger and larger administrative fee payments from the Manufacturers during the relevant time period.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

343. A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion.

344. In exchange for the Manufacturers inflating these prices and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant Manufacturer Defendants' diabetes medications with the most elevated price and that are the most profitable to the PBMs preferred status on their standard formularies.

345. At all times relevant hereto the PBM Defendants have known that the list prices for the at-issue drugs are grossly inflated. Indeed, the Manufacturers' list prices have become so untethered from the Manufacturers' net prices[10] as to constitute false and unlawful prices.

346. Despite this knowledge, PBMs include this false price—often the AWP price—in their contracts as a basis to set the rate that payors pay for the at-issue drugs and pharmacies are reimbursed for the at-issue drugs.

347. Moreover, the PBMs also use this false price to misrepresent the amount of "savings" they generate for diabetics, payors and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary." Likewise, in April 2019, CVS Caremark President and Executive Vice Price President of CVS Health Corp. Derica Rice stated, "Over the last three years . . . CVS Caremark

---

[10] "Net Price" refers to the Manufacturers' list price minus all Manufacturer Payments paid to the PBMs.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."

348.    The PBM Defendants also misrepresent the amount of "savings" they generate to their payor clients and prospective clients.

349.    In making these representations, the PBMs fail to disclose that the amount of "savings" they have generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical pricing chain and which the PBMs are directly responsible for artificially inflating.

350.    Importantly, the Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants, that each agreed to and participated in and that created enormous profits for all of Defendants.   For example:

- Manufacturers and PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also determining the same for competing products;

- Manufacturers and PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail order pharmacy claims, internal medical efficacy studies and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes OptumInsight and Optum Analytics; and

- Manufacturers and PBMs engage in coordinated outreach programs directly to patients, pharmacies and prescribing physicians to convince

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients. For example, the January 2021 Senate Insulin Report released an email where Eli Lilly discussed paying Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan.[11] I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."

351.    Far from using their prodigious bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars at the expense of Illinois diabetics and payors.

**E.    Defendants Admit That They Have Engaged in the Insulin Pricing Scheme**

352.    On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing

---

[11] "Pull through" is an industry term that refers to an integrated process between PBMs and Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

Scheme titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."

353.    Representatives from all Defendants testified at the hearing and each acknowledged before Congress that the price for insulin has increased exponentially in the past fifteen (15) years.

354.    Representatives from each Defendant explicitly admitted that the price that diabetics have to pay out-of-pocket for insulin is too high. For example:

- Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [list] prices for insulin have increased nearly 50 percent. And over the last ten years, [list] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

pocket costs for Lantus have risen approximately 60 percent for patients . . ."

- Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [list] prices of our medicines. We also know that [list] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

355. Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased costs or improved clinical benefit.

356. None of the Defendants pointed to any other participant in the pharmaceutical pricing chain as responsible for the exorbitant price increases for these diabetes medications—nor could they—for these Defendants collectively are solely responsible for the price of almost every single vial of insulin sold in the United States.

357. Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

358. For example, at the April 2019 Congressional hearing Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:

> [T]here is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [list] prices high. And *we've been participating in that system* because the higher the [list] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions. (Emphasis added).

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

359.    Eli Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:

> Seventy-five percent of our [list] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

360.    Sanofi has also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

361.    PBM Defendants also admitted at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by Manufacturer Defendants.

362.    Amy Bricker, President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, answered, "Manufacturers do give higher [payments] for exclusive [formulary] position . . ."

363.    While all Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, in an effort to avoid culpability for the precipitous price increase each Defendant group pointed the finger at the other as the responsible party.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

364. PBM Defendants specifically testified to Congress that Manufacturer Defendants are solely responsible for their price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

365. This statement is objectively false. The Manufacturers' coordinated, lockstep price increases are a direct reflection of the PBMs' coordinated requests for larger Manufacturer Payments. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California titled "The Association Between Drug Rebates and List Prices," found that an increase in the amount that the Manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.

366. In addition, in a 2019 report the National Community Pharmacists Association estimated that Manufacturer Payments add nearly 30 cents per dollar to the price consumers pay for prescriptions.

367. Further, in large part because of the increased list prices, and related Manufacturer Payments, PBMs profit per prescription has grown exponentially over the same time period that insulin prices have been increasing. By way of example, since 2003 Defendant Express Scripts has seen its profit per prescription increase over 500 percent per adjusted prescription.

368.  The Manufacturers, on the other hand, argued before Congress that the PBMs were to blame for high insulin prices because of their demands for higher Manufacturer Payments in exchange for formulary placement.

369.  However, that also is not true. For example, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that Manufacturer Defendants are still making substantial profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBMs. During the same time period when insulin price increases were at their steepest, distributions to Manufacturers' shareholders in the form of cash dividends and share repurchases totaled *$122 billion*. In fact, during this time period the Manufacturers spent a significantly lower proportion of profits on research and development compared to shareholder payouts.

370.  The January 2021 Senate Insulin Report concluded, *inter alia*:

- Manufacturer Defendants are retaining more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;

- Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs; and

- Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs. From 2016 to 2020, Novo Nordisk spent approximately $29 billion on stock buybacks and shareholder dividend payouts while only spending approximately $12 billion on R&D costs.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

371.    The truth is—despite their finger pointing in front of Congress—Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme. This reality was echoed in the statement from the Senate Insulin Report, summarizing Congress's findings of their two-year probe into the Insulin Pricing Scheme:

> [M]anufacturers and [PBMs] have created a vicious cycle of price increases that have sent costs for patients and taxpayers through the roof . . . This industry is anything but a free market when PBMs spur drug makers to hike list prices in order to secure prime formulary placement and greater rebates and fees.

**F.      Defendants Profit Off the Insulin Pricing Scheme**

**1.      Manufacturers Profit Off Insulin Pricing Scheme**

372.    For Manufacturer Defendants, the Insulin Pricing Scheme affords them the ability to pay the PBM Defendants significant, yet undisclosed, Manufacturer Payments in exchange for formulary placement—which garners Manufacturer Defendants greater revenues from sales—without decreasing their profit margins. During the relevant time period, PBM Defendants granted preferred formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

373.    Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

**2.      PBMs Profit Off Insulin Pricing Scheme**

374.    Because of the increased list prices, and related Manufacturer Payments, PBMs' profit per prescription has grown exponentially during the relevant time

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

period. A recent study published in the Journal of the American Medical Association titled, "Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies and Health Plans from 2014 to 2018" concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased over 150% from 2014 to 2018. In fact, for transactions where the PBM Defendants control the insurer, the PBM and the pharmacy (i.e. Aetna-Caremark-CVS pharmacy) these Defendants now capture an astonishing 50% of the money spent on each insulin prescription (up from only 25% in 2014), despite the fact that they do not contribute to the development, manufacture, innovation or production of the product.

375.   PBM Defendants profit off the artificially inflated prices created by the Insulin Pricing Scheme in myriad ways, including (1) retaining a significant—yet undisclosed—percentage of the Manufacturers Payments, (2) using the inflated price to generate profits from pharmacies in their networks and (3) relying on the inflated price to drive up the PBMs' profits through their own mail order and retail pharmacies.

<em>a)     PBMs pocket most of the secret Manufacturer Payments</em>

376.   The first way in which the PBMs profit off the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

377.   The amount that the Manufacturers pay back to the PBMs has accelerated to represent a large percentage of the list price of diabetes medications.

88

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

378.    Historically, when PBMs contracted with payors, the contract allowed the PBM to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

379.    Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturers to the PBMs. But—critically—"rebates" are only a portion of the total secret Manufacturer Payments.

380.    In this regard, PBM and Manufacturer Defendants have created a "hide-the-ball" system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled. As more payors moved to contracts that require PBMs to pass a majority of the manufacturer "rebates" through to the payor, PBMs have begun renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as "rebates" are now called administrative fees, volume discounts, service fees, inflation fees or other industry jargon terms designed to obfuscate and distract from the substantial sums being secretly exchanged.

381.    And these renamed secret Manufacturer Payments are indeed substantial. A heavily redacted complaint filed by Defendant Express Scripts revealed that *Express Scripts now retains up to 13 times more in "administrative fees" than it passes through to payors in formulary rebates.*

382.    Notably, on June 17, 2022, the Federal Trade Commission ("FTC") voted 5-0 to issue a policy statement expressing its intent to closely scrutinize such PBM Defendant practices related to Manufacturer Payments to determine if these practices constitute unfair and deceptive practices.  In its policy statement, the FTC cited

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

specifically to the effect that Manufacturer Payments have in the context of the exorbitant insulin prices and the devastating impact such practices have on the lives of diabetics.

383.   In addition, the PBMs have come up with numerous ingenious methods to hide these renamed Manufacturer Payments in order keep them for themselves.

384.   For example, with regard to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

385.   In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" in order to increase the price of their diabetes medications. The thresholds for these payments are typically set around 6% to 8%—if the Manufacturer Defendants raise their prices by more than 6% (or 8%) during a specified time period they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the artificially inflated prices).

386.   For many of their clients, the PBMs have separate "price protection guarantees" that state that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will revert a portion of that amount back to these clients.

387.   The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 12%-15%.

FILED DATE: 12/2/2022 12:33 PM 2022CH11699

388.    If the Manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate but less than the 10%-15% client price protection guarantee rate, then the PBMs can keep 100% of these "inflation fee" payments. This is a win-win for the Manufacturers and PBMs—they get to mutually retain and share all of the benefit of these price increases.

389.    Another method that the PBMs have devised to hide the renamed Manufacturer Payments is through the use of "rebate aggregators." Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturers, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

390.    These rebate aggregators are often owned and controlled by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).

391.    The PBMs carefully guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships and not reporting them separately in their quarterly SEC filings.

392.    Certain rebate aggregator companies are located offshore, for example, in Switzerland (Express Scripts' Ascent Health) and in Ireland (OptumRx's Emisar Pharma Services), making oversight even more difficult.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

393.    Moreover, during the relevant time period the PBM Defendants have used their controlled rebate aggregator entities in furtherance of their conspiracy. For example, a 2017 audit conducted by a local governmental entity on Defendant OptumRx related to its PBM activities from January 1, 2013 until December 31, 2015 concluded that the auditor was unable to verify the percentage of rebates OptumRx passed through to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.

394.    A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc."

395.    In other words, according to this audit report, OptumRx contracts with its own affiliate rebate aggregator, Coalition for Advanced Pharmacy Services, who then contracts with OptumRx's co-conspirator, Express Scripts, who then contracts with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then uses this complex relationship between itself, its affiliate, and its co-

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

conspirator to obscure the amount of Manufacturer Payments that are being generated from its client's utilization.

396.   The January 2021 Senate Insulin Report contained the following observation on these rebate aggregators:

> [I]t is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

397.   Because the PBMs are able to hide (and retain) a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Insulin Pricing Scheme.

398.   Even in the rare cases where certain sophisticated payor clients receive a portion of the Manufacturer Payments from their particular pharmacy benefit manager (whether it is a PBM Defendant or not), those payors are still significantly overcharged as a direct result of the Insulin Pricing Scheme given the extent to which Defendants have inflated the prices of the at-issue drugs.

### b)   PBMs profit off pharmacies

399.   A second way that PBM Defendants profit off the Insulin Pricing Scheme is by using the artificially inflated price generated by the scheme to profit off the pharmacies with whom they contract, including those in Illinois.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

400.    PBM Defendants decide which pharmacies are included in the PBM's network and how much they will reimburse these pharmacies for each drug dispensed.

401.    PBMs pocket the spread between the amount that the PBMs get paid by their clients for the at-issue drugs (which is based on the artificially generated prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less).

402.    PBMs do not disclose to their clients or network pharmacies how much the PBM is receiving from or paying to the other.

403.    This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from PBM Defendants to take into account the cost effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal. The higher the Manufacturers inflate their prices, the more money the PBMs make off this spread.

404.    PBMs also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR fees[12], based on the artificially inflated prices generated by the Scheme—and again, the higher the list price for each diabetes medication sold, the more the PBMs generate in these pharmacy fees.

---

[12] "DIR" fees are post-purchase concessions pharmacies pay back to the PBMs.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

c)   *Insulin Pricing Scheme increases PBM mail order and retail pharmacy profits*

405.   A third way PBMs profit off the Insulin Pricing Scheme is through the PBM Defendants' own mail order and retail pharmacies. The higher the price that PBM Defendants are able to get their customers, such as Illinois diabetics and payors, including the State, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail order and retail pharmacies.

406.   Because the PBMs base the price they charge for the at-issue diabetes medications on the list price, the more the Manufacturers inflate these prices, the more money the PBMs make.

407.   PBMs also charge the Manufacturer Defendants fees related to their mail order pharmacies, such as pharmacy supplemental discount fees, indirect purchase fees and rebates, that are directly tied to the false prices generated by the Insulin Pricing Scheme. Thus, once again, the higher the price is, the more money the PBMs make on these fees.

408.   Another way the PBMs generate pharmacy profits from the inflated prices generated by the Insulin Pricing Scheme is by way of an arbitrage purchase scheme. Because of their coordinated efforts with the Manufacturers in furtherance of the Insulin Pricing Scheme, the PBMs often know when the Manufacturers are going to raise their prices. The PBMs use this knowledge to purchase large quantities of the at-issue drugs prior to the price increases at a lower price. The PBMs then charge diabetics and payors the higher price after the increase

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

409.    In sum, every way that the PBMs make money on diabetes medications is directly tied to the artificially inflated list prices generated by the Insulin Pricing Scheme. PBMs are not lowering the price of diabetes medications as they publicly represent—rather they are making billions of dollars by fueling these skyrocketing prices.

**G.    Illinois Diabetics Purchase the At-Issue Drugs from Defendants**

410.    During the relevant time period, the PBM Defendants' mail order and retail pharmacies dispensed the at-issue drugs to and were paid by Illinois diabetics based on the inflated list prices generated by the Insulin Pricing Scheme.

**H.    Defendants Deceived Illinois Diabetics**

411.    At no time have either Defendant group disclosed the Insulin Pricing Scheme or the artificially inflated list prices produced by it.

1.    <u>Manufacturer Defendants deceived Illinois Diabetics</u>

412.    At all times during the relevant time period, Manufacturer and PBM Defendants knew that diabetics and payors relied on the artificially inflated list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs. That is, Illinois diabetics and payors relied on the artificially inflated list prices by purchasing diabetic medications at such prices.

413.    Manufacturer and PBM Defendants further knew that Illinois diabetics and payors expected and desired to pay the lowest fair-market price possible for the at-issue drugs.

414.    Manufacturer and PBM Defendants knew that the artificially inflated list prices generated by the Insulin Pricing Scheme were false and completely

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

untethered from the net prices that the Manufacturer Defendants were paid for the drugs.

415.   As the list prices for the at-issue drugs detached completely from actual prices, the list prices became increasingly misrepresentative to the point of becoming unlawful.

416.   Despite this knowledge, Manufacturer Defendants caused the artificially inflated list prices generated by the Insulin Pricing Scheme to be published throughout Illinois through publishing compendia and in various promotional and marketing materials distributed by entities downstream in the drug supply chain.

417.   Manufacturer Defendants also published these prices to the PBMs and their pharmacies who then knowingly use the false prices to set the amount payors and diabetics pay for the at-issue drugs.

418.   By publishing their prices throughout Illinois, the Manufacturers held these prices out as a reasonable price by which to base the prices diabetics and payors pay for the at-issue drugs.

419.   These representations are false. Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to the net price they received for the at-issue drugs and were not based on transparent or competitive factors such as cost of production or research and development.

420.   Notably, during the relevant time period, the Manufacturers published prices in Illinois of $300-$400 for the same at-issue drugs they could have priced at less than $2 and still been profitable.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

421.    Manufacturer Defendants have also publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for Chief Executive Officer (CEO) Dave Ricks as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant time period, executives from Sanofi and Novo Nordisk also represented that research and development costs were key factors driving the at-issue price increases.

422.    These statements are also false. Between 2005 and 2018, Eli Lilly only spent $680 million on R&D costs related to Humalog while earning $31.35 billion in *net* sales during that same time period. In other words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant time period. And Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.

423.    The Manufacturers' list prices were artificially inflated in furtherance of the Insulin Pricing Scheme to generate profits for the Manufacturer and PBM Defendants.

424.    Manufacturer Defendants affirmatively withheld the truth from Illinois diabetics and payors and specifically made these misrepresentations in furtherance of the Insulin Pricing Scheme and to induce reliance in payors and diabetics to purchase their at-issue drugs.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

425. PBM Defendants ensured that the Manufacturers' artificially inflated list prices harmed diabetics and payors by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

426. PBMs perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom.

2.   PBM Defendants deceived Illinois diabetics

427. PBM Defendants have deceived diabetics and payors in Illinois.

428. Throughout the relevant time period, PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with diabetics and payors; (b) they work to lower the price of the at-issue drugs and, in doing so, they achieve substantial savings for diabetics and payors; and (c) that the PBMs construct formularies designed to improve the health of diabetics.

429. PBMs understand that diabetics and payors and their beneficiaries rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve their health.

430. At no time have the PBM Defendants disclosed their knowledge of the artificially inflated list prices for the at-issue drugs; to the contrary, the PBMs ensured that diabetics and payors pay based on those artificially inflated list prices.

431. In addition to the general PBM misrepresentations discussed above in the Parties section, throughout the relevant time period, PBM Defendants have

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

purposefully, consistently, and routinely made misrepresentations specifically about the at-issue Manufacturer Payments, formulary construction, and the PBMs' role in the diabetic pricing system. Examples include:

- In a public statement issued on May 11, 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."

- On June 22, 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."

- On August 31, 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts released a statement that stated "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."

  - Mr. Stettin continued on to represent that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."

- In January 2017, Tim Wentworth, CEO of Express Scripts represented that "without PBMs, and specifically without Express Scripts, our clients would pay [many times] more for [insulin]."

  - Mr Wentworth continued on to state Express Scripts is dedicated to controlling insulin prices because "we stand up for payers and patients."

- On June 1, 2018, Mark Merritt, President of the PCMA, in response to a question about PBMs' role in the insulin pricing system stated, "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

- On April 4, 2019, Steve Miller Express Scripts' chief medical officer stated that Express Scripts "give[s] people who rely on insulin greater affordability and cost predictability so they can focus on what matters most: their well-being.

- CVS Caremark's Chief Policy and External Affairs Officer testified during the April 2019 hearings that, CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."

- Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."

- The PCMA website contains the following misrepresentations, "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins. PBMs work hard to drive down costs using formulary management and rebates."

432. PBM Defendants not only falsely represent that they negotiate with Manufacturer Defendants to lower the price of the at-issue diabetes medications for *payors*, but also for diabetic *patients* as well. Examples include:

- Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (Emphasis added).

- Amy Bricker, President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs." (Emphasis added).

- Amy Bricker of Express Scripts also testified at the Congressional hearing that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications." (Emphasis added).

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

- OptumRx's website has stated "[t]he services we provide help *improve health outcomes for patients* while making prescription drugs more affordable for plan sponsors and *individuals*, and more sustainable for the country . . . the reason is simple: drug manufacturers are responsible for the high cost of prescription drugs . . . OptumRx negotiates better prices with drug manufacturers for our customers *and consumers* . . . At OptumRx, *our mission is helping people live healthier lives* and *to help make the health system work better for everyone.*" (Emphasis added).

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative." (Emphasis added).

- The PCMA website states, "PBMs have kept average out-of-pocket (OOP) payments flat for beneficiaries with commercial insurance."

- On March 12, 2019, OptumRx represented, "OptumRx is uniquely able to deploy the broadest range of tools to rein in high drug prices, [which] demonstrates our commitment to delivering better prices for consumers."

433.   Not only have PBM Defendants intentionally misrepresented that they use their market power to save payors and diabetics money, they have specifically, knowingly, and falsely disavowed that their conduct drives the artificially inflated list prices higher. Examples include:

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated, "Drugmakers set prices, and we exist to bring those prices down."

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017, "Any suggestion that PBMs are causing prices to rise is simply erroneous."

- In 2017, Express Scripts' Wentworth went on CBS News to again argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

increase, OptumRx's Chief Medical Officer answered, "we can't see a correlation when rebates raise list prices."

- In 2019, when testifying under oath before Congress on the rising price of insulins, Senior Vice President Amy Bricker of Express Scripts testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."

434. Throughout the relevant time period, PBM Defendants have also misrepresented that they are transparent about the Manufacturer Payments that they receive and that they pass along (or do not pass along) to payors. As stated above, PBM Defendants retain many times more in total Manufacturer Payments than the traditional formulary "rebates" they may pass through—in whole or part—to payors.

435. Despite this, in 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]veryday we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."

436. In a 2017 CBS News interview, Express Scripts' CEO, represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments it receives and that payors, "know exactly how the dollars flow" with respect to these Manufacturer Payments.

437. When testifying before Congress in April 2019, Amy Bricker, President of Express Scripts, had the following exchange with Representative John Sarbanes of Maryland regarding the transparency (and lack thereof) of the Manufacturer Payments:

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

for them is transparent to them. . . [However] the reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].

Mr. Sarbanes. What about if we made it completely transparent? Who would be for that?

Ms. Bricker. Absolutely not . . . it will hurt the consumer.

Mr. Sarbanes. I don't buy it.

Ms. Bricker – prices will be held high.

Mr. Sarbanes. I am not buying it. I think a system has been built that allows for gaming to go on and you have all got your talking points. Ms. Tregoning [of Sanofi], you have said you want to guarantee patient access and affordability at least ten times, which is great, but there is a collaboration going on here . . . the system is working for both of you at the expense of the patient. Now I reserve most of my frustration for the moment in this setting for the PBMs, because I think the lack of transparency is allowing for a lot of manipulation. I think the rebate system is totally screwed up, that without transparency there is opportunity for a lot of hocus-pocus to go on with the rebates. Because the list price ends up being unreal in certain ways except to the extent that it leaves certain patients holding the bag, then the rebate is negotiated, but we don't know exactly what happens when the rebate is exchanged in terms of who ultimately benefits from that. And I think we need more transparency and I do not buy the argument that the patient is going to be worse off, the consumer is going to be worse off if we have absolute transparency . . . *I know when you started out, I understand what the mission was originally with the PBMs . . . But now things have gotten out of control. You are too big and the lack of transparency allows you to manipulate the system at the expense of the patients.* So I don't buy the argument that the patient and consumer is going to get hurt if we have absolute transparency. (Emphasis added)

438.    Throughout the relevant time period, the PBMs have made the foregoing misrepresentations consistently and directly to Illinois diabetics through member communications, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

439.   PBM Defendants also make these same representations directly to their payor clients, including the State—that their interests are aligned with their payor clients, that they lower the price of the at-issue drugs, and that their formulary construction is for the benefit of diabetics and payors.

440.   The above stated PBM Defendants' representations are false.

441.   Contrary to their representations that they lower the price of the at-issue drugs for diabetics and payors, PBMs' formulary construction and the Manufacturer Payments they receive in exchange for formulary placement have caused the price paid by diabetics and payors to significantly increase.

442.   For example, both diabetics and payors in Europe and Canada pay significantly less for their diabetes medications than diabetics in the United States who are affected by the Insulin Pricing Scheme.

443.   In addition, diabetics that receive their medications from federal programs that do not utilize PBMs also pay significant less. For example, in December 2020, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report that found that federal health care programs that negotiate directly with the Manufacturers (such as the Department of Veterans Affairs), and thus are outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program which relies on the PBM Defendants to set their at-issue drug prices (and thus are victims of the PBMs' concerted efforts to drive up the list prices).

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

444. Contrary to their representations that they work to promote the health of diabetics as a result of the Insulin Pricing Scheme many diabetics have been priced out of these life-sustaining medications. As a result, many of these diabetics are forced to either ration their insulin or to skip doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

445. Both PBM and Manufacturer Defendants knew that these representations were false when they made them and affirmatively withheld the truth regarding the artificially inflated list prices, formulary construction, and Manufacturer Payments from the Illinois diabetics and the State. Both PBM Defendants and Manufacturer Defendants intended for Illinois residents with diabetes to rely on their misrepresentations

446. Defendants concealed the falsity of these representations by closely guarding their pricing structures, agreements, and sales figures.

447. Manufacturer Defendants do not disclose to diabetics, payors or the public the actual prices they receive for the at-issue drugs or the amount in Manufacturer Payments they pay to the PBM Defendants.

448. PBM Defendants do not disclose to diabetics, payors or the public the details of their agreements with Manufacturer Defendants or the Manufacturer Payments they receive from them—nor do they disclose the details related to their agreements with payors and pharmacies.

449. Each Defendant also conceals its unfair and deceptive conduct by signing confidentiality agreements with any entity in the supply chain with whom it contracts.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

450.    PBM Defendants have gone as far as suing governmental entities to block the release of details on their pricing agreements with Manufacturers and pharmacies.

451.    Even when audited by payors, PBM Defendants often still refuse to disclose their agreements with Manufacturers and pharmacies, relying on overly broad confidential agreements, claims of trade secrets and other unnecessary restrictions.

452.    Each Defendant's effort to conceal its pricing structures for the at-issue drugs is evidence that each Defendant knows its conduct is unfair and deceptive.

453.    To make matters worse, Illinois diabetics have no choice but to pay based on Defendants' artificially inflated list prices because they need these medications to survive, the Manufacturer Defendants make virtually all of the diabetes medications available in Illinois, and the PBM Defendants completely dominate the pharmacy benefit services market and control nearly every Manufacturer Payment paid in the market.

454.    In sum, the entire insulin pricing structure created by the Defendants— from the false prices, to the Manufacturers' misrepresentations related to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics— is unfair and deceptive.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

455. Illinois diabetics and the State did not know, because the Defendants affirmatively concealed, that (i) the list prices were artificially inflated; (ii) the list prices were manipulated to satisfy Defendants' profit demands; (iii) the list prices bore no relationship to the net prices paid for the at-issue drugs to the Manufacturers; and (iv) that the entire insulin pricing structure Defendants created was unfair and deceptive.

## I.   The Insulin Pricing Scheme Has Damaged Illinois Diabetics

### 1.   The Insulin Pricing Scheme has damaged the State by increasing its healthcare costs and decreasing productivity

456. As discussed below, the rising price for the at-issue drugs has had a devastating effect on the health of diabetics. It has also caused a staggering increase in healthcare costs to the State.

457. As a direct result of the Insulin Pricing Scheme, 1 in 4 Illinois diabetics can no longer afford their diabetes medication and are forced to ration and skip doses. This forced lack of adherence to their diabetes medications leads to substantial additional healthcare costs.

458. One national model projected that improved adherence to diabetes medication would avert 699,000 emergency department visits and 341,000 hospitalizations annually, for a savings of $4.7 billion. The model further found that eliminating the loss of adherence would lead to another $3.6 billion in savings, for a combined potential savings of $8.3 billion.

459. Much of the increased healthcare costs caused by the Insulin Pricing Scheme are shouldered by the State. As a result of the Insulin Pricing Scheme, the

FILED DATE: 12/2/2022 12:33 PM 2022CH11699

amount Illinois spends each year on diabetes-related healthcare costs has risen dramatically during the relevant time period, now totaling in the billions of dollars per year.

460.    Lack of adherence to diabetes medications also has a significant adverse effect on labor productivity in terms of absenteeism (missing work due to health-related reasons), presenteeism (being present at work but not productive), and disability (inability to perform necessary physical tasks at work).

461.    This decrease in work productivity has further damaged the State by injuring its economy and decreasing its tax revenue.

2.    The Insulin Pricing Scheme has damaged Illinois Diabetics

462.    Whether insured or not, all Illinois diabetics pay a substantial part of their diabetic drug costs based on Defendants' artificially inflated list prices generated and thus the Insulin Pricing Scheme has directly damaged Illinois diabetics.

463.    According to a recent Report to the Illinois General Assembly on Insulin Pricing ("Illinois Report"), 95% of Illinois diabetics have reported that they have had prescribers change insulin products due to cost and 75% of Illinois diabetics have taken less than their prescribed insulin doses so that their supply would last longer.

464.    In addition to financial losses, for many diabetics in Illinois, the Insulin Pricing Scheme has cost them their health and emotional well-being. Unable to afford Defendants' price increases, many diabetics in Illinois have begun to engage in highly risky behaviors with respect to their disease such as rationing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves,

FILED DATE: 12/2/2022 12:33 PM  2022CH11699

foregoing one or even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness, which harm not only the individual persons affected, but also harm the Illinois healthcare system as a whole by burdening its resources and the Illinois economy by requiring additional millions of dollars of additional revenues to be spent.

465.    Even when diabetics can still afford their diabetic medications, as a direct result of PBM Defendants shifting which diabetes medications are favored on their formularies ("non-medical switching"), diabetics are often forced to switch medications every few years or go through a lengthy appeal process (or try the favored drug first) before receiving the patient's preferred medication.

466.    Non-medical switching for biologic drugs, such as the at-issue drugs, causes increased health problems for diabetics and increased healthcare costs for diabetics, payors, and the healthcare system.

467.    According to the Illinois Report, Illinois pharmacists and diabetes educators recently indicated that 96% of their patients experienced a non-medical switch.

468.    The Insulin Pricing Scheme has pushed, and will continue to push, access to these lifesaving drugs out of reach for many diabetes patients in Illinois.

469.    Because Illinois diabetics continue to pay for the at-issue drugs based on the artificially inflated prices generated by the Insulin Pricing Scheme, the harm is ongoing.

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

### J.    Defendants' Recent Efforts in Response to Rising Insulin Prices

470.    In reaction to the mounting political and public pressure, Defendants recently have taken action, both on Capitol Hill and in the insulin marketplace.

471.    In recent years, Novo Nordisk's political action committee ("PAC") has doubled its spending on federal campaign donations and on lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its biggest ever investment in directly influencing U.S. policymakers.

472.    Eli Lilly and Sanofi have directed millions of dollars through their PACs as well in recent years.

473.    Likewise, the PBM Defendants have steadily increased their political spending for the past five years as public outcry has grown against them.

474.    Defendants have also recently begun introducing programs ostensibly aimed at lowering the cost of insulins.

475.    These affordability measures fail to address the structural issues that have given rise to the price hikes. Rather, these steps are merely public relations stunts that do not solve the problem.

476.    For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

477.    However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

FILED DATE: 12/2/2022 12:33 PM  2022CH11699

478.    Following this, a Congressional staff report was issued examining the availability of this drug. The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.

479.    The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without."

480.    In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous.

481.    In fact, in August 2019, a Type 1 diabetic who could no longer afford his $1,200 a month insulin prescription died months after switching to ReliOn brand insulin due to complications from the disease.

482.    Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem. Illinois diabetics and the State, continue to suffer great harm as a result of the Insulin Pricing Scheme.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

## VI.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act")**
**(Against All Defendants)**

483.   The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

484.   Defendants are "persons" within the meaning of, and subject to, the provisions of the Consumer Fraud Act, 815 ILCS 505/1.

485.   The business practices of Defendants fall within the definitions of "trade" and "commerce" under 815 ILCS 505/1.

486.   By engaging in the Insulin Pricing Scheme, as described herein, Defendants have committed unfair and deceptive acts and practices in the conduct of trade or commerce within Illinois with the intent that Illinois diabetics rely on them as prohibited by the Consumer Fraud Act, 815 ILCS 505/2.

487.   Defendants are both independently liable for their own misconduct in violation of the Consumer Fraud Act, as well as liable for their collective efforts in furtherance of the Insulin Pricing Scheme. Using a complex structure of interdependent entities, Defendants confuse and mislead consumers about each Defendants' respective roles in an attempt to evade liability for the unfair and deceptive scheme as a whole, and for the acts and omissions of the enterprise's interdependent participants.

488.   In particular, the Defendants engaged in the Insulin Pricing Scheme, which includes:

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

- Manufacturer Defendants engaged in deceptive practices by publishing prices for the at-issue drugs—and in doing so held these prices out as the actual prices for these drugs—despite knowing these prices were artificially inflated and untethered from the price the Manufacturers were paid for the drugs.

- Manufacturers also made false statements related to the reason behind their artificially inflated prices (research and development costs), when in fact, the Manufacturers artificially inflated these prices solely for the purpose of increasing their profits and offering higher prices and larger Manufacturer Payments to the PBMs.

- PBM Defendants ensured that these artificially inflated prices harm diabetics and payors by utilizing the inflated prices to set the price paid by virtually all payors and Illinois diabetics.

- PBMs represent to the public, diabetics, and their clients that they work to lower the price of the at-issue drugs and to promote the health of diabetics. In contradiction to these representations, the PBMs have driven up the at-issue prices and damaged the health of diabetics by:

  - demanding ever increasing Manufacturer Payments which increase the at-issue prices. The PBMs have hidden, obfuscated, and laundered these Manufacturer Payments through their affiliated entities in order to keep a large percentage of these payments;

  - selecting higher priced diabetes medications for formulary placement and excluding lower priced ones in order to generate larger profits;

  - working in coordination with the Manufacturers to increase the availability of higher priced diabetes drugs which are more profitable for Defendants; and

  - engaging in continuous non-medical formula switching of the at-issue drugs in order to drive up their profits to the direct detriment to the health of diabetics.

489.    Defendants conduct in furtherance of the Insulin Pricing Scheme also violates Section 2 of the Consumer Fraud Act because it constitutes deceptive trade practices under the "Uniform Deceptive Trade Practices Act" [815 ILCS 510/2], including:

114

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

- Representing that goods or services have characteristics and benefits that they do not have. 815 ILCS 510/2(a)(5). In particular:

  - Price is a characteristic of every good in Illinois. Manufacturer Defendants reported and published artificially inflated prices for each at-issue drug and in doing so represented that the reported prices were reasonably related to the net prices for the at-issue drugs.

  - PBM Defendants misrepresented that their formularies and the Manufacturer Payments they receive have the characteristic and benefit of lowering the price of the at-issue drugs and promoting the health of diabetics.

- Making false and/or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions. 815 ILCS 510/2(a)(11). In particular:

  - PBM Defendants utilized the artificially inflated price—which the PBMs are directly responsible for inflating and which the PBMs know is untethered from the actual price—to make false and/or misleading statements regarding the amount of savings that the PBMs generate for Illinois diabetics, payors, and the Illinois healthcare system.

  - PBM Defendants also misrepresented to Illinois diabetics and payors that the Manufacturer Payments they received lowered the actual price of the at-issue drugs.

490. Defendants' conduct also constitutes unfair acts and practices as prohibited by the Consumer Fraud Act, 815 ILCS 505/2, because it caused substantial injury, cannot be reasonably avoided, and there are no countervailing benefits to consumers that result from Defendants egregiously driving up the price of the at-issue drugs. In particular:

- Diabetics in Illinois need these diabetes medications to survive.

- Manufacturer Defendants make nearly every single vial of insulin available in Illinois.

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

- PBM Defendants completely dominate the pharmacy benefit services market and control nearly every Manufacturer Payment paid in this market.

- The price increases for the at-issue drugs bear no relation to manufacturing or production cost increases or changes in supply and demand conditions.

- In fact, the prices have become so untethered from production costs, that insulins, which the Manufacturer Defendants could *profitably price at less than $2 a vial*, are now priced at up to $400 a vial or more.

- There are no conceivable benefits to diabetics or payors in Illinois to being forced to pay these egregious prices for medicines they need to stay alive. In fact, the opposite is true—as a direct result of Defendants' egregious price increases, the health and wellbeing of diabetics in Illinois has been severely and detrimentally impacted and these diabetics have overpaid millions of dollars for the at-issue drugs.

- Defendants' misconduct caused a substantial injury to Illinois diabetics and the State.

491.  Defendants misconduct is also unfair because it violates Illinois public policy in several respects, including:

- It is a public policy in Illinois that diabetics and their families should have access to and not be priced out of the at-issue life-saving medications.[13]

- In addition, as exhibited by Ill. Admin. Code tit. 14, § 470.250, it is also against Illinois public policy to claim an actual savings from a list price or term of similar meaning unless the 'list price' is the price at which the product is offered by a reasonable number of sellers. Here, as explained above, the PBMs use the artificial prices generated by the Insulin Pricing

---

[13] *See, e.g.*, Illinois Senator Andy Manar in discussing the Illinois law capping insulin out of pocket spending, 215 ILCS 5/356z.41, "[t]he swift passage of the insulin bill, driven by ordinary people, shows that Illinoisans are united by the simple belief that no family should ever be forced to ration or go without life-saving medication"; Illinois Governor JB Pritzker statement on the passage of SB2969 that required insurances to cover essential diabetic tools, "But for too long, diabetics have had to make the impossible choice between obtaining this necessary medical equipment or putting food on the table. That is an unacceptable burden to ask diabetics to bear...."; *see also* Report to General Assembly on Insulin Pricing at https://www2.illinois.gov/sites/Insurance/Reports/Reports/Insulin-Pricing-Report-November-2020.pdf;

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

Scheme to misrepresent the amount of "savings" they generate for Illinois diabetics, payors and the healthcare system.

## SECOND CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

492. The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

493. Defendants unjustly deceived Illinois diabetics and the State, and have received a financial windfall from the Insulin Pricing Scheme at the expense of the State and Illinois diabetics.

494. Defendants wrongfully secured and retained unjust benefits from Illinois diabetics and the State, in the form of amounts paid for diabetes medications and fees and payments collected based on the artificially inflated prices generated by the Insulin Pricing Scheme.

495. It is inequitable and unconscionable for Defendants to retain these benefits.

496. Defendants have been enriched by revenue resulting from the Insulin Pricing Scheme while Illinois diabetics and the State have been impoverished by Defendants' misconduct. Defendants' enrichment and Illinois diabetics' and State's impoverishment are connected.

497. Defendants retention of these benefits violates fundamental principles of justice, equity, and good conscience.

498. Accordingly, Defendants should not be permitted to retain the proceeds from the benefits conferred upon them by the Insulin Pricing Scheme. The State seeks

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

disgorgement of Defendants' unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and seeks restitution and/or recission, in an equitable and efficient fashion to be determined by the Court.

499.   There is no express contract governing the dispute at-issue. PBMs do not contract with payors, including the State, on an individual drug basis.   The State's claims do not arise out of a contract, but rather are based on the larger unfair and deceptive Scheme that drove up the at-issue artificially inflated list prices for all Illinois diabetics and the State.

500.   As a direct and proximate cause of Defendants' unjust enrichment, as referenced above, Illinois diabetics and the State suffered, and continue to suffer, ascertainable losses and monetary harm as specified herein in an amount to be determined at trial.

## VII.   PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the State of Illinois, *ex rel.* Kwame Raoul, Attorney General, prays that this Honorable Court enter an Order:

A.   Finding that Defendants' acts and practices alleged herein are violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* and that Defendants' conduct violated the common law cause of action alleged herein;

B.   Preliminarily and permanently enjoining Defendants and their employees, officers, directors, agents, successors, assigns, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and any and all persons acting in concert or participation

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

with Defendants from continuing the unlawful method, acts, and practices described above;

C.   Requiring Defendants to pay all restitution that may be owed to Illinois consumers affected by Defendants' unlawful acts and practices, pursuant to 815 ILCS 505/7;

D.   Ordering the Defendants to pay up to $50,000 per deceptive or unfair act or practice and an additional amount of $50,000 per each violation if the deceptive or unfair act or practice is found to have been committed with intent, as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7;

E.   Disgorging all revenues, profits, and gains achieved in whole or in part through the unfair and/or deceptive acts or practices complained of herein;

F.   Requiring Defendants to pay all of the State's costs in this investigation and litigation, including, but not limited to, expert witness fees, attorney's fees and costs;

G.   Awarding all other restitution, disgorgement, penalties under the state laws set forth in this Complaint and the general equitable powers of this Court as set forth in Section 7 of the Consumer Fraud Act;

H.   Awarding pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint; and

119

FILED DATE: 12/2/2022 12:33 PM    2022CH11699

I.      Awarding such other, further and different relief as the case may require

and the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED on December 2, 2022.

> **THE STATE OF ILLINOIS, by KWAME RAOUL ATTORNEY GENERAL OF ILLINOIS**
>
> ***/s/ David F. Buysse***
> David F. Buysse (IL Bar No. 3126915)
> Deputy Chief, Public Interest Division
> Office of the Attorney General of Illinois
> 100 W. Randolph Street –12ᵗʰ Floor
> Tel. (312) 590-7844
> david.buysse@ilag.gov
> Attorney No. 99000

Darren Kinkead (IL Bar No. 6304847)
Deputy Chief, Special Litigation Bureau
Office of the Attorney General of Illinois
100 W. Randolph Street –11th Floor
Tel. (773)590-6967
darren.kinkead@ilag.gov

Edwin S. Gault, Jr. (IL Bar No.6314552)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
Tel. (601) 960-8600
Fax. (601) 960-8613
win.gault@formanwatkins.com

James F. Clayborne (IL Bar No. 06199209)
CLAYBORNE & WAGNER LLP
525 W. Main Street, Suite 105
Tel. (618) 239-0187
Fax. (618) 416-7556

FILED DATE: 12/2/2022 12:33 PM   2022CH11699

jclayborne@cswlawllp.com

W. Lawrence Deas, Esquire (*pro hac vice* forthcoming)
lawrence@listondeas.com
LISTON DEAS PLLC
William Liston III, Esquire (*pro hac vice* forthcoming)
william@listondeas.com
Post Office Box 14127
Jackson, Mississippi 39236
Tel. (601) 981-1636

Joanne Cicala, Esquire (*pro hac vice* forthcoming)
Josh Wackerly, Esquire (*pro hac vice* forthcoming)
R. Johan Conrod, Esquire (*pro hac vice* forthcoming)
THE CICALA LAW FIRM PLLC
101 College Street Dripping Springs, Texas 78620
Tel. (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com
johan@cicalapllc.com

Matthew C. McDonald, Esquire (*pro hac vice* forthcoming)
DAVID NUTT & ASSOCIATES
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Tel. (601) 898-7302
Mattm@davidnutt.com